WILL NELSON V. STATE.

No. A-49. Opinion Filed February 3, 1910.

(106 Pac. 467.)

1. HOMICIDE—Dying Declarations—Belief of Death. Dying declarations are admissible on a trial for murder as to the fact of the homicide and the person by whom it was committed when made under the belief of certainty of death.

2. SAME—Admissibility—Evidence. For evidence sufficient to warrant the admission of a dying declaration see opinion.

3.   **WITNESSES — Cross-Examination — Criminal Career.** For the purpose of affecting the credibility of a witness ·he ·may be asked, on cross-examination, if he has been convicted of a felony or ·of any crime which involves moral turpitude; but it is prejudicial error to ask such witness if he has been indicted, arrested, or imprisoned for a misdemeanor, or if he has been charged or arrested or imprisoned, before conviction, for any offense whatever.

4.   **INSTRUCTIONS—Credibility of Witnesses.** For an approved instruction as to rules by which a jury should be governed in weighing testimony, see opinion under fifth assignment of error.

   (Syllabus by the Court.)

*Error from District Court, Pushmataha County; Malcolm E. Rosser, Judge.*

Will Nelson was convicted of manslaughter, and brings error. Reversed and remanded.

Plaintiff in error here, who was defendant in the lower court, was tried in the district court of Pushmataha county at the September term, 1908, charged with murder. He was convicted of the crime of manslaughter and sentenced to imprisonment for 10 years. The evidence as disclosed in the record is to the effect that this defendant, together with others, engaged in a free for all fight, in which Sam Wright was mortally wounded, and from the effects of the wounds died two days later. The defendant and others were drinking, and Davis Miller and the deceased became engaged in a fight in which the defendant took part, and, as disclosed by the evidence of two witnesses, the defendant and his associates were fighting Sam Wright. The case is before us on appeal.

*C. E. Dudley* and *Wm. M. Cravens,* for plaintiff in error.— On admissibility of dying declarations: Enc. of Ev., vol. 4, p. 925; *People v. Taylor,* 59 Cal. 640; *People v. Lanagan,* 81 Cal. 142. On cross-examination touching witness' criminal record: *Slater v. U. S.,* 1 Okla. Cr. 275.

*Charles West,* Atty. Gen., and *Chas. L. Moore,* Asst, Atty. Gen., for the State.

OWEN, JUDGE (after stating the facts as above). Counsel for defendant urge five assignments of error, as follows:

(1) That the court erred in permitting the county attorney to ask leading questions.

(2) That the court erred in admitting, over the objection of plaintiff in error, as dying declarations, the statements of Sam Wright as purported to have been made to Dr. Walker, Jack Wright, and Mrs. C. E. Mullens.

(3) That the trial court erred in excluding from the jury the testimony of Myatt Greenwood to the effect that Bish Landrum became angry at the defendant on account of the defendant's refusing to permit Landrum to fire his pistol, and that he rode away from the crowd, but returned in about an hour and a half in company with the deceased.

(4) That the trial court erred in permitting the county attorney to force plaintiff in error, over his objection, to testify on cross-examination the number of times he had been arrested.

(5) That the court erred in instructing the jury as to the rules of evidence in passing upon the weight of testimony.

Under the second assignment, counsel urge that the court erred in admitting the statements of the deceased because it does not sufficiently appear that the statements were made under belief of immediate death. We understand the rule to be, as was announced by this court in the case of *Bilton v. Territory,* 1 Okla. Cr. 566, 99 Pac. 163, to render a dying 'declaration admissible in evidence, it must have been made when the declarant was not only *in extremis,* but also had abandoned all hope of living.

Wigmore on Evidence, § 1440, announces the rule in the following language:

"It follows from the general principle that the belief must be, not merely of the possibility of death, nor even of its probability, but of its certainty. A less stringent rule might with safety have been adopted; but this is the accepted one. The essential idea is that the belief should be a positive and absolute one, not limited by doubts or reserves; so that no room is left for the operation of worldly motives."

Wharton on Homicide (3d Ed.) § 635, says:

"A statement of the deceased is admissible in evidence as a dying declaration if it satisfactorily appears therefrom that at the time he believed that he must soon die from the effects of the injury with reference to which he makes the statement. And, as a general rule, a sufficient predicate is laid for the admission of dying declarations by a repeatedly expressed assertion upon the part of the declarant that he would die. And this is the rule, though he was told by his physician or others that he might get well, and though it did not appear that his attending physician had told him that he was going to die, or though his doctor had tried to encourage him as to his condition."

There was no error on the part of the trial court in admitting the statements of the deceased. In our opinion the evidence as it appears in the record is sufficient to comply with the rule and render the statement admissible as a dying declaration.

Dr. I. D. Walker testified in part as follows:

"Q. When was the first time you saw him after he was injured? A. Sunday morning early. Q. What was his condition then? A. Bad. He was able to sit up to have his wounds dressed by us propping him up. Q. Was he very seriously injured? A. Yes, sir. Q. What statement, if any, did he make to you as to his condition, as to whether or not he was in a dangerous condition? A. Yes, sir. Q. What did he say? A. I had dressed Sam before, and I made the remark that, 'You are skinned up a good deal,' and he says, 'Yes, Doctor, they have got me this time.' Q. What else, if anything, on that line did he say? A. He talked a great deal, but I don't remember just the words he used; but that is the most he said. Q. Was he at that time in a dangerous condition and liable to die at any time? A. He was in a condition that I thought he would die later from the injuries he had. Q. How many days did he live after that? A. That was Sunday, and I think he died Wednesday. Q. At any other time during your treatment of him did he state to you, or in your presence, anything relative to the condition he was in? A. I do not remember that he did. Q. Did his condition grow worse? A. Yes, sir. Q. Now, Doctor, did he make at any time after you visited him that morning, did he make any statement to you or in your presence as to who injured him? By Mr. Dudley: Q. You did not intimate to him, did you, Doctor, that he was going to die? A. No, sir. Q. What the doctor has to say to a patient has a great deal to do with the condition of the patient's mind as

to whether he is going to die or whether he is going to get well? A. Yes, sir. Q. Did you encourage him to believe he would get well? A. Yes, sir. Q. Did you encouage him to believe that he would get well, or did·you try to encourage him to get well? A. I wanted to make him believe he was not as bad hurt as he thought he was. Q. Did what you say make him believe it? A. No, sir; I don't think it did. By the Court: Q. Did he at any time while you were treating him talk or act as if he expected to get well? A. No, sir. Q. What was his conduct with reference to what he believed about going to get well? A. Sam was very uneasy, and he knew he was hurt bad all the time. Q. Did he state to you what it was.that had produced these injuries? Who was it, Doctor? A. The names were not familiar to me only three were familiar, Myatt Greenwood, Alen Greenwood, and Will Nelson. Q. Sam Wright is dead, is he? A. Yes, sir. Q. I believe that you stated, Doctor, that his death resulted from those wounds? A. Yes, sir."

Jack Wright, father of deceased, testified in part as follows:

"Q. When you went to where he was, what was the first thing he said to you? A. When I went there, I stepped in the house, and he was lying on the bed. The bed stood inside the door and his feet was lying toward the door, and his head back crossways of the bed, on his side; and I walked up to the side of his bed, and he just turned over this way, and says, 'Papa, they have got me this time.' And I said, 'Sam, who did it?' Q. When you asked Sam who did it, whom did he say? A. Sam said Will Nelson, Myatt Greenwood, Willie Nelson, Morris Bison, and Davis Miller. I took the names down as he called them, and, after I got them down, I showed them to him, and he said that was right. Q. What was his condition from that time on until he died? Pretty sick? A. Yes, sir; he was in a great deal of pain, and could not bear to be moved. Q. Did he make the statement more than the one time to you as to who.it was that had injured him? More than this one time, or in your presence? A. Yes, sir; I think he did."

Mrs. C. E. Mullens, a sister of the deceased, testified in part as follows:

"Q. When you went to Mr. Moore's house, did Sam say anything as indicating the condition he was in? As to whether he was in a dangerous condition or not? A. The first words he spoke were to a man standing at his feet. Q. What did he say?

A. He said, 'Well, old boy, they have got me this time.' Q. You may state what, if anything, as to what he said then indicating whether or not he realized the condition he was in? A. He didn't do or say anything except about the disposition of his property. Q. What did he say? A. He said let his wife go to her father's. He said, if he could have lived five years longer, he could have put them in more comfortable condition. Q. Did he say anything about anything else on that day which indicated that he realized the condition he was in? A. He spoke of sending for his mother."

Wigmore in his work on Evidence (section 1442) ''says:

"In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances. It has been contended that only the statements of the declarant could be considered for this purpose; or, less broadly that the nature of the injury alone could not be sufficient; i. e., in effect that the declarant must have shown in some way by conduct or language that he knew he was going to die. This, however, is without good reason. We may avail ourselves of any means of inferring the existence of such knowledge; and, if in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude"—
citing with approval *Woodcock's Case,* Leach Cr. L. (4th Ed.) 500, in which it was said:

"My judgment is that inasmuch as she was mortally wounded and was in a condition which rendered almost immediate death inevitable, as she was thought by every person about her to be dying, though it was difficult to get from her particular explanations as to what she thought of herself and her situation; her declarations made under these circumstances ought to be considered by a jury as being made under the impression of her approaching dissolution; for, resigned as she appeared to be, she must have felt the hand of death, and must have considered herself as a dying woman."

In the case of *Oliver v. State,* 17 Ala. 594, it was held:

"The court must look to all the circumstances under which they were made; and, if they be sufficient to induce the belief that the deceased made them under the sense of impending death, the declarations are admissible."

The statement, as shown by the testimony of Dr. Walker,

Jack Wright, and Mrs. C. E. Mullens, considered in connection with his condition, the number of wounds and the nature of the same, was admissible as a dying declaration.

Under the third assignment of error, counsel urge that the court erred in excluding from the jury the testimony of Myatt Greenwood, which was to the effect that Bish Landrum got mad because the defendant and others would not let him get his pistol off his horse and shoot, and that Landrum then went off and came back with the deceased riding behind him on his horse. The record discloses that Will Nelson, the defendant, with eight others, was at the residence of Zadic Anderson; that the crowd were drinking and dancing, and that Bish Landrum got mad and rode away, but after an hour and a half returned in company with the deceased; and that soon thereafter deceased and the defendant, together with several others, became engaged in a fight, and that five or six of those present, including the defendant, were fighting the deceased. The record discloses that the fight began by the deceased saying, "I am a Democrat and a man," to which Davis Miller replied, "I am a Republican and a man." There is no evidence in the record to indicate that Bish Landrum's getting mad and leaving the crowd was in any way connected with the difficulty, or that he took part in the fight. There was no error in excluding the testimony offered. It was no part of the *res gestae*.

The testimony complained of under the fourth assignment of error is as follows:

"How many times have you been arrested, Will? A. I don't know. Have been arrested a good many times. Q. You have been arrested for fighting, haven't you, Will? A. Yes, sir. Q. Been arrested for introducing whisky? A. Yes, sir. Q. What else have you been arrested for? A. Getting drunk, carrying a six-shooter, and disturbing the peace. Don't know how many times I have been arrested for getting drunk. Q. Have you ever served a sentence in a jail? A. Yes, sir; arrested me for pint of whisky. I plead guilty, and got 91 days in the Ft. Smith jail."

The action of the court in compelling the defendant to answer these questions constitute prejudicial error, and for that

reason this case must be reversed and a new trial granted. This court held this to be reversible error in the case of *Slater v. United States,* 1 Okla. Cr. 275, 98 Pac. 110; *Keys v. United States,* 2 Okla. Cr. 647, 103 Pac. 874.

The instruction complained of under the fifth assignment of error is as follows:

"You are the sole judges of the credibility of the witnesses and the weight to be given to the testimony of each. If the testimony of a witness is apparently candid and fair, reasonable within itself, and he has been in no way impeached, you should not arbitrarily discard his testimony. It is your duty to reconcile the testimony if you reasonably can, so that it may all stand. If you cannot reconcile the testimony, then, for the purpose of ascertaining what testimony is worthy of credit, you take into consideration the apparent candor and fairness of a witness, the reasonableness or unreasonableness of his or her story whether or not the witness has been in any way impeached, the interest of the witness in the case, if any, whether or not the witness had made contradictory statements and all the circumstances surrounding the case."

We find no error in the giving of this instruction.

For the error complained of under the fourth assignment, the case is reversed and remanded, with directions to grant the defendant a new trial.

FURMAN, PRESIDING JUDGE, and DOYLE, JUDGE, concur.