2009 OK CR 32

Latoris DeWayne COLLINS, Appellant

v.

STATE of Oklahoma, Appellee.

No. F–2008–654.

Court of Criminal Appeals of Oklahoma.

Dec. 17, 2009.

James Hughes, Assistant Public Defender, Oklahoma City, OK, attorney for defendant at trial.

Jimmy Harmon, Assistant District Attorney, Oklahoma City, OK, attorney for the state at trial.

Marva A. Banks, Assistant Public Defender, Oklahoma City, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Donald D. Self, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

CHAPEL, Judge.

¶ 1 LaToris DeWayne Collins was tried by jury and convicted on two counts of Rape in the First Degree, in violation of 21 O.S.Supp.2006, §§ 1111 & 1114 (Counts I and IV); and two counts of Kidnapping, in violation of 21 O.S.Supp.2004, § 741 (Counts III and V), all After Two or More Previous Felony Convictions, in the District Court of Oklahoma County, Case No. CF–2006–6326.[1] In accordance with the jury's recommendation, the Honorable Virgil Black sentenced Collins to imprisonment for twenty (20) years on each of the four counts, with Counts I and III to run concurrently, but consecutively to Counts IV and V, which also run concurrently with each other. Counts I and IV are subject to the 85% Rule, pursuant to 21 O.S.Supp.2002, § 13.1(10).

¶ 2 C.M. first met LaToris Collins outside an Oklahoma City night club, in the early morning hours of August 26, 2006. C.M. was in her van, smoking marijuana laced with crack cocaine. C.M. testified that at some point her lighter ran out of fluid, and she approached a white Cadillac and asked to borrow a lighter. Collins and a man identified as his cousin were in the car and invited C.M. inside to smoke crack cocaine with them. The cousin eventually returned to the club, leaving Collins and C.M. in the car.

---

1. Collins was also charged, but acquitted, on two counts of Forcible Oral Sodomy, in violation of 21 O.S.Supp.2006, § 888 (Counts II and VI). Counts I, II, III, and VI involved female victim "C.M.," while Counts IV and V involved female victim "C.F." The State presented evidence during the second stage of the trial that Collins had prior convictions for Felony Larceny of Merchandise from a Retailer (1986), Concealing Stolen Property (1994), First Degree Burglary (1996), Possession of Controlled Dangerous Substance (1996), and Domestic Abuse (2003). The Judgment and Sentence document in this case fails to note that all four conviction counts were found to be After Two or More Previous Felony Convictions and must be corrected accordingly.

C.M. testified that she smoked approximately five dollars worth of crack with Collins.

¶ 3 After an alert from Collins' radar detector, Collins suggested the pair circle the block in order to avoid the police, and C.M. agreed. Rather than going around the block, however, Collins drove straight ahead and on to I-35. Noting the change in course, C.M. twice asked Collins to pull over and let her out of the car. Collins refused and began driving faster.

¶ 4 Collins eventually pulled off the interstate and parked at a convenience store, because his car was overheating. While Collins was in the store, C.M. remained in the car. C.M. testified that she could have left, but that she stayed because she hoped to get more drugs from Collins. They eventually arrived at Collins' house, and C.M. followed Collins into his bedroom. Upon entering the bedroom, Collins told C.M. that she owed him for the drugs she had already used. Collins also told C.M. that he had been to prison, that he had a gun, and that he would use it if she did not comply with his demands. Collins then told C.M. to remove her clothes.

¶ 5 After C.M. removed her clothes, Collins performed oral sex on her and ordered C.M. to perform oral sex on him. At this point C.M. reached for a curtain above the bed, in an attempt to escape through the window, and Collins responded by punching her in the nose. C.M. then performed oral sex on Collins, at one point biting his penis in an effort to end the sexual assault. After that, Collins forced C.M.'s legs open and vaginally raped her. During the rape, C.M.'s husband called her on her cell phone, which C.M. had concealed near her head in hopes of dialing 911. When he heard the ringing, Collins took C.M.'s phone, bent it so that it no longer worked correctly, and threw it in a nearby basket.

¶ 6 After raping C.M., a more docile Collins offered to drive her back to the club where her van was parked. As the two walked off Collins' porch, however, C.M. bolted to a neighbor's house and asked to use the phone. There C.M. called her husband to come and get her. When her husband arrived, she relayed to him the story of what had happened. C.M.'s husband then called

the police, and the couple waited outside Collins' home until officers arrived.

¶ 7 C.K. first met Collins on September 2, 2006, one week after the rape of C.M., at the Oklahoma City apartment of an acquaintance known to C.K. only as "Therman." C.K. went to Therman's apartment to meet her friend, April, for a shopping trip to the mall. Shortly after being introduced, Collins asked C.K. if she could help him with some grocery shopping, as he had recently had prostate surgery and needed assistance. After C.K. got into Collins' car, Collins told C.K. that he had to go back to his house to get some money. When they arrived at Collins' house, C.K. stood in the doorway while Collins retrieved his money. Rather than going to the grocery store, however, Collins then drove to a nearby liquor store and ordered C.K. to go in and buy him a bottle of Kentucky Deluxe bourbon.

¶ 8 After the trip to the liquor store, Collins told C.K. that he again needed to return to his home, to get more money for the grocery store. C.K. grudgingly agreed. Upon arriving at the house, C.K. entered, and Collins invited her into his bedroom to see his collection of suits. C.K. went into the bedroom to look at the clothes, and after briefly listening to Collins brag about his fashion collection, C.K. asked to be returned to her car. Instead, Collins locked the bedroom door. Collins then showed C.K. an old picture of himself, wearing what appeared to be a prison uniform. Collins bragged that he had been in prison for murder and asked C.K. how much she would charge to allow him to "eat [her] pussy." C.K. was shocked and confused by this request and declined, saying she would only do such things with her boyfriend or husband. Collins then accused C.K. of "playing him." After C.K. attempted to answer a call from her thirteen-year-old son, Collins took C.K.'s cell phone, laying it on the floor behind him. C.K.'s phone would continue to ring while Collins sexually assaulted her.

¶ 9 Now acutely aware of her situation, C.K. began to cry and told Collins again that she wanted to leave. In response, Collins called C.K. a "stupid bitch" and threatened

to "fuck [her] up." Collins then told C.K. that if she did not remove her clothes and stop crying, he was going to get his gun and put it in her mouth.[2] C.K. removed all of her clothes, and Collins pushed her onto the bed and vaginally raped her.[3]

¶ 10 After the rape, Collins asked C.K. to get him a glass of water. C.K. complied, and Collins politely thanked her.[4] Going back outside, Collins asked C.K. to grab a garden hose, in order to help him put water in his car, which was overheating. C.K. again complied, but when Collins returned to the house to get something, she took off and ran several blocks back to Therman's apartment complex, where her car was parked. C.K. first went to Therman's apartment and angrily asked why anyone would let her leave with Collins. C.K. then got in her car and returned home. She reported the rape to police the next day.

¶ 11 Collins appeals from his convictions and sentences, raising three propositions of error.

■ ¶ 12 In Proposition I, Collins claims that the joinder of all the charges against him in a single trial was improper and unfairly prejudiced his right to a fair trial. Collins entered a plea of "not guilty," without objecting to the joinder of the charges or filing a motion to sever, waiving all but plain error review.[5]

¶ 13 Collins contends that joinder of the crimes involving C.M. with those involving C.K. into a single trial did not meet the criteria for joinder set out in *Glass v. State*.[6]

He claims that this joinder prejudiced him, because the State used testimony from an arguably more credible witness, C.K., to bolster the testimony of an arguably less credible witness, C.M.

■ ¶ 14 In *Glass*, this Court held that joinder is permitted when the offenses arise out of the same criminal act or transaction or are part of a series of criminal acts or transactions.[7] Criminal acts are properly called a "series" where the joined counts: (1) refer to the same type of offenses, (2) occurred over a relatively short period of time, (3) in approximately the same location, and (4) proof of each act or transaction overlaps, so as to show a common scheme or plan.[8]

¶ 15 Collins first argues that the offenses did not all occur within the "relatively short period of time" required by *Glass*. This Court has previously upheld joinder where the crimes were separated by as much as four months.[9] The seven-day span between the kidnapping and rape of C.M. and the kidnapping and rape of C.K. is well within the relatively short period of time required by *Glass* and subsequent cases.

¶ 16 Collins also argues that there is insufficient evidence of a "common scheme or plan." Collins contends that while the facts of the C.M. and C.K. cases are arguably similar, similarity alone is not sufficient to indicate a common scheme or plan. Yet there are more than "arguable similarities" between the two cases. The striking commonality of these cases begins with the undisputed satisfaction of two of the other ele-

---

2. Although Collins threatened to use a gun on both victims, neither victim reported actually seeing a firearm.

3. At trial, Doctor John Yuthas testified that in during her initial rape examination, C.K. reported that Collins performed oral sex on her before vaginally raping her. At trial, however, C.K. denied being forced to engage in any sexual activity other than the vaginal rape.

4. C.K. testified that she specifically remembered that this "thank you" had struck her as surreal and odd at the time, considering what Collins had just done to her.

5. *Huddleston v. State*, 1985 OK CR 12, ¶ 12, 695 P.2d 8, 10 (plea to information waives all defects except those that go to jurisdiction).

6. 1985 OK CR 65, 701 P.2d 765.

7. *Id.* at ¶ 8, 701 P.2d at 768. This Court also noted, in *Glass*, that "[m]ere similarity of offenses does not provide an adequate basis for joinder." *Id.* at ¶ 9, 701 P.2d at 768.

8. *Id.; Smith v. State*, 2007 OK CR 16, ¶ 23, 157 P.3d 1155, 1165.

9. *See Lott v. State*, 2004 OK CR 27, ¶ 35, 98 P.3d 318, 333–34 (upheld joinder on rape and murder of two elderly women where crimes separated by four months); *see also Pack v. State*, 1991 OK CR 109, ¶ 8, 819 P.2d 280, 283 (upheld joinder on burglaries that occurred eight weeks apart).

ments in the *Glass* analysis. Not only were the criminal acts charged very similar, with both victims being kidnapped and then raped, the attacks on both women occurred at the same location, Collins' Oklahoma City residence.

¶ 17 Collins' plan of attack against these women was also quite similar. Both women agreed to go somewhere with Collins in his car, but were then brought to his home instead. C.M. left with Collins ostensibly to avoid the police. C.K. went with Collins as a Good Samaritan, under the false impression that Collins was somehow incapacitated. After getting the women into his car, Collins changed the plan and drove to his home. Both women also entered Collins' home and his bedroom under false pretenses. C.M. entered with the expectation that Collins was getting her more drugs. C.K. was brought to Collins' home (twice) so he could get money and was later lured into his bedroom to look at his clothes.

¶ 18 Once Collins had the women inside his bedroom, he began employing force and fear. Collins told C.M. that she owed him for the drugs and told C.K. that she had been leading him on, "playing him." Collins intimidated both women by informing them that he had been to prison, even showing C.K. pictures of himself in a prison uniform; and he threatened both with an unseen gun. Collins

kept the women in his room, after they displayed a desire to leave, by threatening them and later even physically assaulting them.[10] Collins ordered both women to fully disrobe and took their cell phones when their loved ones called, eliminating their ability to call for help. Collins finished the attack by vaginally raping both women, without using a condom.

¶ 19 Requiring overlapping proof of a "common scheme or plan" contemplates that there be a relationship or connection between/among the crimes in question, such that proof of one becomes relevant in proving the other/others. Here, both encounters, taken together, display Collins' unique predatory pattern and common plan of attack. Evidence of this pattern and common plan is relevant to proving both kidnappings and both rapes. We soundly reject Collins' claim that there is no overlapping proof suggesting a common plan.

¶ 20 We further find that Collins' claim of prejudice is unsupported by the record. While C.M.'s testimony about what happened to her was arguably reinforced by C.K.'s testimony, nothing in the record indicates that the jury was unable to independently assess the credibility of each woman and arrive at independent verdicts on each count.[11] Furthermore, there was no "great

---

10. Collins punched C.M. in the nose and forced C.K. onto the bed by pushing her on the throat.

11. Collins argues that the jury's acquittals on Counts II and VI, the forcible oral sodomy counts involving C.M., show that the jury did not believe C.M., and only convicted Collins of kidnapping and raping her due to the bolstering testimony of C.K. We disagree.

This Court notes, in particular, that the acquittals on those counts may well have been the result of the following instruction, which was given to Collins' jury:

No person may be convicted of forcible oral sodomy unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First,* penetration;
*Second,* of the mouth of the defendant;
*Third,* by the mouth or vagina of the defendant or victim;
*Fourth,* by threats of force or violence accompanied by the apparent power of execution.

You are further instructed that any sexual penetration, however slight, is sufficient to complete the crime.

This instruction was based upon an attempt to tailor OUJI–CR (2d) 4–128 to the facts of this case, but this particular adaptation was ultimately confusing, misleading, and inaccurate. Although there were discussions of this instruction during a pre-trial conference, the final instruction, which was drafted later, was not objected to at trial by either party.

Regarding OUJI–CR(2d) 4–128, this Court notes that in cases involving separate counts of forcible oral sodomy, where the crimes alleged involve different factual theories, it is advisable to instruct the jury with separate instructions. In particular, such instructions should make clear whether the crime alleged is forcing the victim to perform oral sex on the perpetrator (penetration of the mouth of the victim by the penis of the defendant) or forcing the victim to endure oral sex performed by the perpetrator (penetration of the vagina of the victim by the mouth of the defendant). Furthermore, this Court also notes that the Fourth Element of this crime should be modified to read "which is ac-

disparity" in the amount of evidence underlying the joined cases.[12]

¶ 21 Collins committed the same types of crimes, only one week apart, at exactly the same location, and the proof of the crimes overlapped significantly. Collins cannot demonstrate that he was unfairly prejudiced by the joinder, and the interest of judicial economy was well served by joining these two cases. This proposition is rejected accordingly.

■■■■ ¶ 22 In Proposition II, Collins argues that that the trial court erred by granting the State's motion *in limine* to exclude any mention of C.M.'s history of prostitution.[13] Collins argues that this ruling impaired his ability to impeach C.M. with her past crimes of "moral turpitude." Collins also argues, more broadly, that this exclusion "choked off" his defense and limited his right to confrontation, because the convictions and past acts of prostitution were relevant to prove C.M.'s motive or propensity to lie and to support Collins' defense of consent.[14] Decisions to grant motions *in limine* excluding evidence are within the sound discretion of the trial court, and we review the trial court's decision for an abuse of discretion.[15]

¶ 23 Collins claims that Oklahoma law permits attacking witness credibility with crimes of moral turpitude. This overbroad claim is patently incorrect. The crime of prostitution does not meet the requirements for admissibility as impeachment evidence under 12 O.S.Supp.2004, § 2609. Looking to the statute, § 2609(A)(1) permits impeaching witness credibility with evidence of felony convictions within the last ten years.[16] And § 2609(A)(2) permits impeaching witness credibility with evidence of any conviction (even misdemeanors) involving dishonesty or false statement within that same time period.[17] Collins does not argue that C.M.'s prostitution convictions are felonies; nor does he claim that are they crimes involving dishonesty; nor does he allege that C.M. has had any convictions at all within the last ten years.

¶ 24 The "moral turpitude" language invoked by Collins comes from § 2609(B). This section provides that any conviction of a felony or "a misdemeanor involving moral turpitude," within the preceding ten years, can "revive" previous convictions for felonies or misdemeanors involving dishonesty, which would otherwise be outside of the ten-year window.[18] Nothing in the record reflects that C.M. had *any* prior convictions for felonies or crimes of dishonesty that could be revived by more recent "misdemeanors involving moral turpitude," such as prostitution. And § 2609 does *not* make crimes of moral turpitude, by themselves, generally admissible for impeachment purposes.[19] This

complished by means of force or violence, or threats of force or violence that are accompanied by apparent power of execution." This language would be more clear and would better track the language of 21 O.S.Supp.2006, § 888(B)(3), for cases of forcible sodomy that do not depend upon the age of the victim. We refer this instruction and the Notes on Use regarding it to the Oklahoma Uniform Jury Instructions (Criminal) Committee for the committee's assistance in this matter.

12. *See Smith v. State*, 2007 OK CR 16, ¶ 37, 157 P.3d 1155, 1168.

13. C.M. admitted at the preliminary hearing than she had been a prostitute for 18 years and that she had prostitution convictions in several states. She also testified that she had not been a prostitute for 7 years.

14. Collins also argues, in passing, that exclusion of this evidence deprived him of the right to compulsory process. Collins totally fails to show how his right to compulsory process was infringed, and this claim is rejected accordingly.

15. *Dill v. State*, 2005 OK CR 20, ¶ 5, 122 P.3d 866, 868.

16. *See* 12 O.S.Supp.2004, § 2609(A)(1) & (B) (10–year period measured from date of conviction or release from confinement, whichever is later; 10–year period can sometimes be expanded through giving of prior written notice and court finding that probative value of conviction, within particular case, substantially outweighs its prejudicial effect).

17. 12 O.S.Supp.2004, § 2609(A)(2) & (B).

18. 12 O.S.Supp.2004, § 2609(B).

19. Collins asserts that the idea of using crimes of moral turpitude for impeachment purposes is "ingrained in Oklahoma jurisprudence." He supports this with citations to *Cowan v. State*, 1911 OK CR 83, 5 Okla.Crim. 313, 114 P. 627, and *Nelson v. State*, 1910 OK CR 46, 3 Okla. Crim. 468, 106 P. 647. Both of these cases were decided early in the twentieth century, long before the 1978 adoption of the Oklahoma Rules of

Court finds that the record in this case contains no evidence that C.M. has any convictions that would be admissible for impeachment under § 2609.

¶ 25 Collins also submits that the exclusion of C.M.'s history of prostitution evidence limited his right to confrontation and to present a defense. Collins acknowledges that evidence of past instances of sexual behavior is inadmissible to support a defense of consent under Oklahoma's rape shield law.[20] Collins argues, however, that this evidence was not being offered (or not solely being offered) to prove that C.M. consented, but rather on the legitimate issues of motive, bias, and propensity to lie. Collins seems to be arguing, on appeal, that because C.M. had been a prostitute, she must be a liar; therefore she should not now be believed when she testifies that she did not consent to having sex with him.

¶ 26 At trial, defense counsel waffled between arguing that C.M.'s prostitution convictions and admitted acts were admissible to support Collins' defense of consent, since Collins maintained that the encounter with C.M. was essentially a consensual act of prostitution, where sex acts were traded for drugs, and arguing that the convictions were admissible as impeachment evidence against C.M. These two theories, *i.e.*, consent and credibility, are consistent with the two major justifications by which defendants have historically been allowed to present evidence that a complaining witness is or was a prostitute.[21] And in some states, evidence that a complaining witness has a history of prostitution continues to be admissible in sexual assault cases, at least under certain conditions,

Evidence. The Rules necessarily supersede any contrary evidentiary rulings in these cases.

20. Oklahoma's "rape shield" law, like other such laws, applies in rape and other sexual offense prosecutions and is intended to "shield" the alleged victim from being forced to endure, at the trial of the defendant, the improper use of evidence regarding her (or his) own sexual history and reputation. The basic provisions of Oklahoma's law are as follows:

A. In a criminal case in which a person is accused of a sexual offense against another person, the following is not admissible:

1. Evidence of reputation or opinion regarding other sexual behavior of a victim or the sexual offense alleged.

2. Evidence of specific instances of sexual behavior of an alleged victim with persons other than the accused offered on the issue of whether the alleged victim consented to the sexual behavior with respect to the sexual offense alleged.

See 12 O.S.2001, § 2412(A).

Oklahoma's law provides for only three limited exceptions to this rule of inadmissibility, namely, (1) "[s]pecific instances of sexual behavior if offered for a purpose other than the issue of consent, including proof of the source of semen, pregnancy, disease or injury," (2) "[f]alse allegations of sexual offenses," and (3) "[s]imilar sexual acts in the presence of the accused with persons other than the accused which occur[ ] at the same time of the event giving rise to the sexual offense alleged." 12 O.S.2001, § 2412(B). If a defendant purports to have evidence that fits one of these exceptions, this issue must be resolved at an in-camera hearing, prior to use at trial, according to the procedure established in 12 O.S. 2001, § 2412(C).

21. Before rape shield laws began to be enacted in the 1970's, the two main justifications for allowing complainants (nearly always women) to be interrogated at trial about their own prior sexual history were the issues of *consent* and credibility. Under the consent rationale, sometimes described as the "yes/yes inference," it was held that a woman who had previously consented to some sexual activity outside of marriage was more likely to have consented to the sexual activity at issue at trial, i.e., to any sexual activity. Under the *credibility* rationale, it was held that a woman (though not a man) who had engaged in sexual activity outside of marriage was less credible than a woman who had remained chaste. A third but related justification for the admission of such evidence in some rape trials was the idea that if a woman's history of sexual activity was known to the defendant at the time of the acts alleged, this knowledge was relevant to the defendant's *reasonable belief* that the woman had consented. *See* Clifford S. Fishman, *Consent, Credibility, and the Constitution: Evidence Relating to a Sex Offense Complainant's Past Sexual Behavior*, 44 Cath. U.L.Rev. 709, 713–18 (1995). For a victim with a history of prostitution, the consent and credibility rationales worked powerfully, and "in tandem," to justify the broad admission of this evidence, since a prostitute was considered to be even more likely to have consented to the activity alleged and also more likely to be untruthful about it. *See* Karin S. Portlock, Note, *Status on Trial: The Racial Ramifications of Admitting Prostitution Evidence Under Rape Shield Legislation*, 107 Colum. L.Rev. 1404, 1409–12 (2007). Note: The word "victim," as used herein and also in many state statutes, refers generally to the complaining witness in a sexual offense case.

on the theory that it is relevant to the issue of either consent or credibility.[22] Oklahoma, however, is *not* one of these states.

¶ 27 Oklahoma's rape shield statute contains no exception allowing for a complainant's history of prostitution, either acts or convictions, to be brought out at trial.[23] Thus we must address Collins' claim that Oklahoma's rape shield law must yield to his constitutional rights to present a defense and to confront the witnesses against him. The federal rape shield law, as well as the rape shield laws of many states, contains an explicit exception for instances where the exclusion of a victim's sexual history evidence would violate the constitutional rights of the defendant.[24] Oklahoma's rape shield statute contains no such exception.

¶ 28 This Court notes that in comparison to the federal rape shield statute and those of many other states, Oklahoma's rape shield law is notably broad and robust.[25] Neverthe-

---

**22.** New York is rather unique in its treatment of prostitution convictions, since its rape shield statute contains an explicit exception for prostitution convictions that are within three years prior to the sexual offense alleged, making such convictions always admissible. N.Y.Crim. Pro. Law § 60.42(2) (McKinney 2004). (Commentators note, however, that New York courts have applied this exception to New York's rape shield law quite strictly. See Portlock, 107 Colum. L.Rev. at 1419–20 (discussing cases).) In most states, the admissibility of evidence that a victim has a history of prostitution would be evaluated under the state's general rape shield statute.

A few states have rape shield statutes which specifically provide that sexual history evidence can be admitted to attack the victim's credibility. *See, e.g.,* Cal. Evid.Code § 1103(a)(1) & (c)(5) (West Supp.2009); Del.Code Ann. tit. 11 §§ 3508, 3509(d) (1998); *see also People v. Chandler,* 56 Cal.App.4th 703, 65 Cal.Rptr.2d 687, 690–91 (1997) (noting that "credibility exception" to California rape shield statute "has been utilized sparingly, most often in cases where the victim's prior sexual history is one of prostitution") (listing cases). In a few other states, rape shield statutes specifically provide that sexual history evidence can be admissible to show the victim's consent, so long as certain procedures are followed and standards are met. *See* Nev. Rev.Stat. Ann. §§ 48.069 (West 2009) (accused may present "evidence of any previous sexual conduct of the victim of the crime to prove the victim's consent," in compliance with statutory procedures); Wash. Rev.Code Ann. § 9A.44.020(3) (West 2009) ("victim's past sexual behavior ... is admissible on the issue of consent," in compliance with statutory procedures, including finding that exclusion of evidence "would result in denial of substantial justice to the defendant"). Nevada's approach to prostitution is unique, since, while it continues to allow for legal prostitution, in "licensed house[s] of prostitution," see Nev.Rev.Stat. Ann. § 201.354 (West 2009), the Nevada Supreme Court has held that acts of *illegal* prostitution are simply not covered by that state's rape shield law. *See Drake v. State,* 108 Nev. 523, 836 P.2d 52, 55 (1992) ("Illegal acts of prostitution are not intimate details of private life. They are criminal acts of sexual conduct engaged in, for the most part, with complete strangers. The legislature could not have intended to afford special protection ... to acts of illegal prostitution just because those acts happen to involve sexual conduct.").

In various other states the admissibility of a victim's sexual history evidence, including prostitution evidence, is left largely to the discretion of the trial judge, who must make a case-specific determination regarding the admissibility of this evidence, based mainly on criteria such as relevance and prejudice. *See, e.g.,* Alaska Stat. § 12.45.045(a) (2006); Ark.Code Ann. § 16–42–101(c) (1999); Colo. Rev. State. Ann. § 18–3–407(2) (West Supp.2006); Kan. Stat. Ann. § 21–3525(b) (Supp.2009); N.M. R. Evid. 11–413 (2009); R.I. R. Evid. 412 (2009); S.D. Codified Laws § 23A–22–15 (2004); Wyo. Stat. Ann. § 6–2–312(a) (2007). In these states as well, the admissibility of prostitution evidence would presumably be established by demonstrating that the evidence was relevant either to the victim's consent or the victim's credibility.

**23.** *See* 12 O.S.2001, § 2412 (quoted *supra* in note 20). It is possible that an act of prostitution might fit one of Oklahoma's limited exceptions to the rape shield law, but the exception would not be based upon the fact that the specific act was an act of prostitution. *See id.*

**24.** Fed.R.Evid. 412(b)(1)(c) (making exception to rape shield provisions for "evidence the exclusion of which would violate the constitutional rights of the defendant"); *see also* Conn. Gen. Stat. Ann. § 54–86f (West 2009); D.C.Code § 22–3022(a)(1) (2001); Haw. R. Evid. 412(b)(1); Idaho R. Evid. 412(b)(1); 725 Ill. Comp. Stat. Ann. 5/115–7(a)(2) (West 2009); Iowa Code Ann. Rule 5.412(b)(1) (West 2009); Miss. R. Evid. 412(b)(1); N.D. R. Evid. 412(b)(3); Or.Rev.Stat. Ann. § 40.210(2)(b)(C) (West 2009); Tenn. R. Evid. 412(c)(1); Tex.R. Evid. 412(b)(2)((E)); Utah R. Evid. 412(b)(3).

**25.** The federal statute, along with that of states that are patterned after it, contains an exception for prior sexual activity between the defendant and the complaining witness. *See* Fed.R.Evid. 412(b)(2)(b) (making exception for "evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused

less, this Court also recognizes that where a defendant can establish that in the specific circumstances of a particular case, the unlimited application of Oklahoma's rape shield law will violate the defendant's constitutional trial rights, including the right to present a defense and to confront and cross-examine witnesses, the statutory protection of the complainant must yield to the constitutional rights of the defendant.[26] This determination should be made, initially, at the trial court level, considering all of the specific facts at issue. Where such a conflict arises, the district court should seek to promote the goals of Oklahoma's rape shield law as much as possible, while still ensuring the defendant's fundamental right to a fair trial, including the rights to confront and cross-examine witnesses and to develop and present a defense. Hence any ruling that particular evidence must be admitted at trial, which would otherwise be inadmissible under 12 O.S., § 2412(A), should be narrowly tailored to achieve the end of protecting the rights of the defendant.

¶ 29 Here, Collins totally fails to establish that the exclusion of the evidence regarding C.M.'s history of prostitution amounted to a violation of his constitutional rights. In particular, it must be emphasized that the prostitution evidence that Collins desired to introduce was quite remote, *i.e.,* no convictions within the past ten years and C.M.'s testimony that she had not engaged in prostitution within the preceding seven years. Collins could not point to any outside evidence of recent prostitution activity by C.M.; nor could he point to outside evidence of prostitution activity by C.M. that was similar to the facts brought out at trial. Nevertheless, it should be noted that Oklahoma's rape shield law did not prevent Collins from arguing that the cases on trial were, in fact, examples of sex-for-drugs prostitution, which is precisely what he did at trial.

¶ 30 Furthermore, the exclusion of the history of prostitution evidence did not impact Collins' ability to thoroughly cross-examine and impeach C.M. with admissible evidence. C.M. testified that she was a married woman, at a club, late at night, without her husband, and that she approached Collins' car to ask for a lighter. C.M. stated that she willingly got in Collins' car and moved to the front seat when Collins' cousin went back into the club. C.M. openly testified that she was a drug addict and that she did not try to escape Collins' vehicle when he stopped at the convenience store, because she hoped she would receive more drugs. She also testified that she went into Collins' bedroom willingly, still hoping to get more drugs. This direct testimony was more than adequate to allow Collins to argue, quite forcefully, that C.M. had agreed to consensual sex in exchange for drugs and was now lying to avoid problems with her husband, which was the heart of Collins' defense relative to C.M.

¶ 31 Collins totally fails to explain how admitting evidence of C.M.'s history of prostitution would have demonstrated her bias or her motive or propensity to lie. Although Collins' contention that his sexual encounter with C.M. was an act of prostitution (in exchange for drugs) might have been strengthened if he could also have presented evidence of her actual history as a prostitute, Oklahoma's rape shield statute, on its face, clearly

---

of the sexual misconduct offered by the accused to prove consent ...''). This exception would apply equally to any prior act of prostitution involving the defendant and the alleged victim. Oklahoma law contains no comparable exception.

**26.** *Cf. Davis v. Alaska,* 415 U.S. 308, 311, 320–21, 94 S.Ct. 1105, 1107, 1112, 39 L.Ed.2d 347 (1974) (reversing burglary and grand larceny convictions where defendant prevented from impeaching key State witness with prior juvenile delinquency adjudication—involving two burglaries—under state law protecting confidentiality of juvenile records). In *Davis,* the Supreme Court found that the defendant had been "denied the right of effective cross-examination" and that "the right of confrontation is paramount to the State's policy of protecting a juvenile offender." *Id.* at 318, 319, 94 S.Ct. at 1111, 1112; *see also id.* at 320, 94 S.Ct. at 1112 ("[T]he State's desire that Green fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of petitioner to seek out the truth in the process of defending himself."). The decision of the Supreme Court of New Mexico in *State v. Stephen F.,* 144 N.M. 360, 188 P.3d 84 (2008), presents an admirable example of the kind of careful, case-specific analysis that is required in the context of balancing rape shield laws with a defendant's constitutional trial rights.

prohibits this evidence. In addition, this Court finds that the exclusion of this sexual history evidence, in the context of this case, did not unconstitutionally impair Collins' right to present his defense or to confront and cross-examine the witnesses against him. This claim is rejected accordingly.

¶ 32 In Proposition III, which purports to be a cumulative error claim, Collins asserts three new substantive claims, including a claim of prosecutorial misconduct and two claims of improperly admitted evidence. Under our recently revised Rule 3.5(A)(5), combining multiple issues in a single proposition is clearly improper and constitutes waiver of the alleged errors.[27] As such, this proposition is denied.[28] Nevertheless, we further find that any errors committed during Collins' trial, even considered cumulatively, did not render his trial, as a whole, unfair; nor did they make his sentence excessive.[29]

¶ 33 After thorough consideration of the entire record before us on appeal, including the original record, transcripts, exhibits, and briefs, we find that relief is not required by law or evidence.

### Decision

¶ 34 Collins' **CONVICTIONS** for two counts of First–Degree Rape (Counts I and IV) and two counts of Kidnapping (Counts III and V) are **AFFIRMED.** The **SENTENCES** announced by the trial court on these convictions are also **AFFIRMED.** Nevertheless, this case is **REMANDED** to the district court for correction of the Judgment and Sentence document, through an order nunc pro tunc, to reflect that all four of these convictions were found to be After Two or More Previous Felony Convictions. Pursuant to Rule 3.15, *Rules of the Oklahoma*

*Court of Criminal Appeals,* Title 22, Ch.18, App. (2009), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, P.J., A. JOHNSON, V.P.J. and LEWIS, J.: concur.

LUMPKIN, J. concur in results.

LUMPKIN, Judge: concur in results.

¶ 1 While I agree that the proper result is reached in this case, I cannot join in the *dicta* resulting from the discussion of nongermane issues and the attempt to provide a mini law review article in the s. As I have previously noted in *Cannon v. State,* 1995 OK CR 45 (Lumpkin Concur in Results) ¶ 2, 904 P.2d 89, 108 (citing *Wainwright v. Witt,* 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985)), "while there are exceptions, statements in footnotes are generally regarded as *dicta,* having no precedential value". While the discussion of the evidence of prostitution is interesting, the bottom line is that the Oklahoma Rape Shield Law does not allow it and that in this case the denial did not deny Appellant any constitutional right. Based on that holding, I can join in the affirmance of the judgment and sentence in this case.

---

27. *See* Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2008) ("Each proposition of error shall be set out separately in the brief. Merely mentioning a possible issue in an argument or citation to authority does not constitute the raising of a proposition of error on appeal. Failure to list an issue pursuant to these requirements constitutes waiver of alleged error.").

28. This Court notes that these improperly presented claims have been reviewed on their merits and have been found to be non-meritorious.

29. *See Sanders v. State,* 2002 OK CR 42, 60 P.3d 1048, 1051. In light of his criminal history, Collins received the minimum sentence (20 years) on each count. Additionally, the trial court ran counts I and III, the crimes against C.M., as well as counts IV and V, the crimes against C.K., concurrently, though the crimes against the two victims were run consecutively, for an effective total sentence of 40 years.