HOLTZCLAW v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:HOLTZCLAW v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 HOLTZCLAW v. STATE
2019 OK CR 17
Case Number: F-2016-62
Decided: 08/01/2019
DANIEL K. HOLTZCLAW, Appellant v. THE STATE OF OKLAHOMA, Appellee.

Cite as: 2019 OK CR 17, __ __

 

OPINION
KUEHN, VICE PRESIDING JUDGE:
¶1 Daniel K. Holtzclaw was tried by jury and convicted of Sexual Battery in violation of 21 O.S.Supp.2013, § 1123(B) (Counts 1, 13, 14, 30, 33 and 34); Procuring Lewd Exhibition in violation of 21 O.S.2011, § 1021 (Counts 4, 5, and 15); Forcible Oral Sodomy in violation of 21 O.S.2011, § 888 (Counts 8, 10, 16, and 27); Rape in the First Degree in violation of 21 O.S.2011, §§ 1111, 1114 (Counts 11, 28, 29 and 32); and Rape in the Second Degree in violation of 21 O.S.2011, §§ 1111, 1114 (Count 31), in the District Court of Oklahoma County, Case No. CF-2014-5869.[1] In accordance with the jury's recommendation the Honorable Timothy R. Henderson sentenced Appellant to eight (8) years imprisonment on each of Counts 1, 13, 14, 30, 33 and 34; five (5) years imprisonment on each of Counts 4, 5, and 15; twenty (20) years imprisonment (Count 8); sixteen (16) years imprisonment on each of Counts 10, 16, and 27; thirty (30) years imprisonment on each of Counts 11, 28, 29, and 32; and twelve (12) years imprisonment (Count 31), all to run consecutively. Appellant must serve 85% of his sentences on Counts 8, 10, 11, 16, 27, 28, 29, and 32 before becoming eligible for parole consideration. 21 O.S.Supp.2015, § 13.1. Appellant appeals from these convictions and sentences, and raises seven propositions of error in support of his appeal.
Facts
¶2 From at least February 2014 to June 2014 Holtzclaw, an Oklahoma City police officer, sexually assaulted women in northeast Oklahoma City. An investigation into Appellant's activities began in earnest in late June of 2014. T.M. had reported in late May that a police officer sexually assaulted her on May 8, 2014. While that claim was being investigated, J.L. reported on June 18, 2014 that Appellant sexually assaulted her during a traffic stop early that morning. This led to a larger investigation. Officers used police department records, including warrants check logs, computer reports, computer dispatch records, and the automatic vehicle locator in Appellant's patrol car to identify women with whom Appellant had contact, and to confirm the time frame and locations of the crimes. They also used surveillance video from local businesses.
¶3 Eventually Appellant was charged with assaulting thirteen women. Jurors acquitted him of all charges involving five women: C.R., F.M., T.M., K.L., and S.H. He was acquitted of some charges and convicted of others for each of two women: T.B. (convicted of three, acquitted of two) and R.G. (convicted of one, acquitted of one). He was convicted of all charges concerning six women: S.E. (four counts), C.J. (two counts), J.L. (two counts), S.B. (two counts), R.C. (one count), and A.G. (three counts).
¶4 Taken together, the women's stories form a pattern wherein Appellant would conduct a traffic stop, or stop the victims while they were walking. While discussing the reason for the stop, he would ask whether the women had any drugs or "anything on them". He would then demand that they show him their breasts or vaginas, often asking how he could be sure the women weren't hiding something in their bra or pants or otherwise referring to the demand as a search. With several victims he touched their breasts or vaginas; he also demanded fellatio from some victims. In addition, he was convicted of five counts of first or second degree rape, and acquitted of three other rape claims. Appellant's threats included taking each of his victims to jail or detox, arresting her, charging her with a crime or promising that if she did as he demanded, he could make warrants or criminal charges go away, or otherwise help her situation. Most of the victims had previous recent contacts with law enforcement; some had outstanding warrants, some had drug paraphernalia on them, some were under the influence of drugs or alcohol when stopped. Sometimes he offered the victims a ride. Most of the crimes occurred late at night or in the early morning hours. The women ranged in age from seventeen to in their fifties. 
¶5 In his defense, Appellant basically asked jurors to accept as true all the information that victims gave about the stops that was amply supported by police records and documents, but to determine that the same victims were lying about the details of the sexual assaults.
Proposition I
¶6 In Proposition I Appellant claims there was insufficient evidence to convict him of procuring lewd exhibition, rape, oral sodomy, or sexual battery. He argues there was no evidence that the alleged "procuring lewd exhibition" occurred in public view; nor was there any evidence that the alleged rape and oral sodomy counts were accomplished by means of the use or threat of force or violence; and the evidence supporting the sexual battery counts was insufficient. We take each of these claims in turn.
¶7 Appellant was convicted on three counts of procuring lewd exhibition.
[2] For each count, the State had to show that Appellant willfully procured the victim to expose herself to public view or to the view of any number of persons, for the sexual stimulation of the viewer. 21 O.S.2011, § 1021(A)(2) (emphasis added). Jurors were correctly instructed on the elements of the crime. The victims in these counts each testified that Appellant demanded they expose their breasts and vagina to him. Moreover, J.L. testified that, after that exposure, Appellant took his penis from his pants, clearly aroused. Taken as a whole, sufficient evidence supports these charges.
¶8 Appellant's primary argument is concerned with the italicized language above. He argues that the State did not show Appellant compelled the victims to expose themselves to public view. Appellant admits that the plain language of the statute also includes exposure to the view of any number of persons. 21 O.S.2011, § 1021(A)(2). On its face, this language would appear to include exposure to one person -- in this case, the Appellant. He argues that the statute should not be so interpreted. He says that "common sense" requires that the person viewing the exposure must be different from the person procuring it. That is, he argues that the crime necessarily requires three people: one to procure the exposure, one to expose herself, and one to see it. He offers no law to support this interpretation. Nor does he convincingly explain why common sense would suggest the Legislature intended to introduce a third person to the equation; his best, unstated, argument is that, under this interpretation, since there were no third persons present Appellant would win.
¶9 "In interpreting a statute, we look to its purpose, the evil to be remedied, and the consequences of any particular interpretation." Rousch v. State, 2017 OK CR 7, ¶ 5, 394 P.3d 1281, 1283. In Section 1021, the Legislature prohibits lewd exhibition, by both the person exhibiting and anyone who encourages or assists them to do so. Appellant suggests that the necessity of a third person is implicit in the language, because, since any person participating in a lewd exhibition would necessarily observe it, without a third person there would be no reason to refer to any type of "view" at all. On the contrary; this is not how statutory interpretation works. In order for the Legislature to protect the public from lewd exposure -- the apparent purpose of this statute -- the language must refer specifically to some type of public or personal view. Even assuming Appellant were correct in stating that one who procured or participated in a lewd exhibition must see it (an assumption we do not make), without specific language including public or personal view as an element, the fact that they or anyone else could see the exhibition would simply not be a crime. That interpretation cannot be what the Legislature intended.
¶10 As the State notes, other courts have interpreted similar language. The New Mexico Court of Appeals found that "public view" meant the crime happened in a place "accessible or visible to the general public", State v. Artrip, 112 N.M. 87, ¶ 4, 811 P.2d 585, 586 (N.M.Ct.App. 1991). The U.S. Court of Appeals for the Armed Forces found that, for indecent exposure, the phrase "public view" focuses on the person who views the indecent exposure, not the nature of the place as accessible to the public; where the crime is willful and a member of the public views the crime, the requirement is satisfied. U.S. v Graham, 56 M.J. 266, 269-70 (C.A.A.F. 2002). Even though these are indecent exposure statutes, the breadth of the interpretation is instructive. In addition, Appellant mistakenly compares the case to this Court's finding in an older case interpreting the old statute of outraging public decency, charged as a sexual assault on a public street. Hulsey v. State, 86 Okla.Crim. 273, 192 P.2d 301 (Ok.Cr.1948). There, because the crime required an act which was committed openly and affected the public, the jury should have been instructed to find whether the offense was committed "open to the view of the public in such a manner that it offended public decency." Id., 192 P.2d at 306. This holding has no bearing on the Appellant's claim. The statute at issue in Hulsey did not refer to "public view" (or public place, for that matter), and it specifically required a finding that members of the public should be able to see and be outraged by the crime. That is not one of the elements of the crime of lewd exhibition, and the discussion in Hulsey is unhelpful.
¶11 Appellant initially notes that the Information states that, in committing the crimes, he acted under his authority as a police officer. Appellant correctly points out that this is not an element of the crime. However, he fails to show how the addition of this language to the Information has any effect on the sufficiency of the evidence. Appellant later returns to this language, arguing that he cannot be convicted of this crime precisely because it was alleged that he acted under authority of his badge. In § 1021.1, the Legislature provides that § 1021 does not apply where the proscribed conduct "occurs in the course of law enforcement activities." 21 O.S.2011, § 1021.1. Appellant admits that he was on duty or in uniform, in a patrol car, and "engaged in a Terry stop" when the crimes occurred. He argues that the statute might be designed to protect officers like him, who are merely searching detainees. He is mistaken. The statute protects persons connected with law enforcement who engage in prohibited sexual activity specifically connected with a law enforcement activity, such as a sting or undercover operation. The whole point in including the "on duty" language in the Information is that Appellant used his position to abuse the public trust afforded police officers -- that is, that this made his actions worse. To construe the statute as Appellant suggests would produce the absurd result of shielding from prosecution any law enforcement officer who commits sex crimes prohibited under this statute while on duty. We will not presume the Legislature intended absurd consequences. Head v. State, 2006 OK CR 44¶ 13, 146 P.3d 1141, 1145. Taking the evidence in the light most favorable to the State, any rational juror could find beyond a reasonable doubt that Appellant committed the crimes of procuring lewd exhibition. Easlick v. State, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559.
¶12 Turning to the second set of charges, Appellant was convicted on four counts of first degree rape.
[3] For each count, the State had to show that Appellant had sexual intercourse with a person not his spouse, using or threatening force or violence, where the defendant had the apparent power to carry out the threat. 21 O.S.2011, §§ 1111(A)(3), 1114(A)(5). Jurors were correctly instructed on the elements of the crime. Appellant claims the State failed to show any evidence that he either used or threatened force or violence. Appellant's position as a police officer put him in a position to make a type of threat not usually open to sexual perpetrators: the threat of incarceration. The victims in these counts each testified that they had warrants or were under the influence when they were stopped, and that Appellant presented them explicitly or implicitly with the choice of sex with him, or going either to detox or jail.
¶13 Appellant claims this is not enough, because the use or threat of force refers exclusively to physical force. On the contrary, the Legislature has specifically defined force:
In all instances of sexual assault including, but not limited to, rape, rape by instrumentation and forcible sodomy where force is alleged, the term "force" shall mean any force, no matter how slight, necessary to accomplish the act without the consent of the victim. The force necessary to constitute an element need not be actual physical force since fear, fright or coercion may take the place of actual physical force.
21 O.S.Supp.2016, § 111. While this definition was adopted by statute in 2016, it mirrors the definition first approved by this Court in 1987, and consistently used since then. Lawson v. State, 1987 OK CR 140, ¶¶ 11-12, 739 P.2d 1006, 1008. The testimony overwhelmingly showed the victims were frightened, coerced by threats of incarceration or detention, and did not consent to sexual intercourse with Appellant. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Appellant committed first degree rape. Easlick, 2004 OK CR 21, ¶ 15, 90 P.3d at 559.
¶14 Appellant was convicted of four counts of forcible oral sodomy.[4] The State had to show that Appellant penetrated the victims' mouths with his penis, using or threatening force or violence with the apparent power of its execution, or that he committed the acts while he was an Oklahoma municipal employee, and upon a person under the legal custody, supervision or authority of an Oklahoma municipality. 21 O.S.2011, § 888(B)(3), (4).
¶15 Appellant first complains that the evidence failed to show he used force or violence in the commission of the acts. As we discuss above, in connection with the rape charges, the definition of "force" includes fear, fright or coercion. 21 O.S.Supp.2016, § 111; Lawson, 1987 OK CR 140, ¶¶ 11-12, 739 P.2d at 1008. Each victim testified that Appellant stopped her and required her to commit fellatio, against her will and without her consent, in lieu of arrest or detention at a detox center. Appellant earlier argued that he could not be guilty of procuring lewd exhibition since each of those acts occurred while, acting as an Oklahoma City police officer, he was attempting to search each victim. Here, where one element of the crime is that the victim is under the legal custody, supervision or authority of an Oklahoma City police officer, he argues that none of the victims were in his custody. He can hardly argue that they were not detained -- since he relies on that for his previous argument -- so instead he claims that the statute does not include routine detention. He offers no law to support this argument, merely claiming "it is not reasonably likely" that is what the Legislature meant. A person is seized by authorities when, under the totality of the circumstances, a reasonable person in that situation would not believe she was free to leave. Skelly v. State, 1994 OK CR 55, ¶ 12, 880 P.2d 401, 405. The victims in these counts each testified that Appellant detained them, and demanded oral gratification during the course of that detention. No reasonable person under the circumstances would have felt free to leave. There is no question but that the victims were under Appellant's supervision and authority when he committed these acts. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Appellant committed forcible oral sodomy. Easlick, 2004 OK CR 21, ¶ 15, 90 P.3d at 559.
¶16 Appellant also claims that the evidence did not support his forcible oral sodomy conviction for Count 8, against R.G. R.G. testified that Appellant stopped her, drove her home, followed her into her bedroom, told her "[T]his is better than county jail," and put his penis in her mouth. This evidence is sufficient to support the jury's determination of guilt. Easlick, 2004 OK CR 21, ¶ 15, 90 P.3d at 559. Appellant argues, essentially, that the jury couldn't have meant it because jurors acquitted him of first degree rape charges against R.G. He implies that the verdicts were inconsistent. Each verdict stands on its own, and we will not disturb a verdict supported by substantial evidence. Smith v. State, 2013 OK CR 14, ¶ 64, 306 P.3d 557, 578; Gray v. State, 1982 OK CR 137, ¶ 20, 650 P.2d 880, 884; U.S. v. Powell, 469 U.S. 57, 67-68, 105 S.Ct 471, 478, 83 L.Ed.2d 461 (1984); Dunn v. U.S., 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932).
¶17 Appellant was convicted of six counts of sexual battery.[5] The State had to show that Appellant intentionally touched, felt or mauled the body of a person over the age of sixteen, in a lewd and lascivious manner, either without her consent or that he committed those acts while employed by an Oklahoma municipality and the victim was under the legal custody, supervision or authority of an Oklahoma municipality. 21 O.S.Supp.2013, § 1123(B)(1), (2). Specifically, Appellant, while acting as a police officer, stopped each woman and demanded to touch her breasts, vagina or both during the course of each stop. The circumstances of each encounter, as related by the victims, supports a conclusion that each individual touching was in a lewd and lascivious manner. Appellant, returning to his earlier argument, claims he was merely engaged in searching each woman pursuant to detention, which he argues was according to department policy. Evidence showed that while OKCPD policy allows male officers to search female detainees, justification for such searches is strictly limited and standard policy is for a female officer to be called to do any search. Evidence also showed the victims and Appellant were aware of this policy, and Appellant had followed it on at least one other occasion. While Appellant was certainly acting as a municipal employee, and the victims were under his supervision and authority, the record does not support his claim that he was merely carrying out official duties. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Appellant committed sexual battery. Easlick, 2004 OK CR 21, ¶ 15, 90 P.3d at 559.
¶18 In summary, sufficient evidence supported Appellant's convictions. Proposition I is denied.
Proposition II
¶19 In Proposition II Appellant claims his cases -- comprising thirty-six allegations involving thirteen victims -- should not have been joined into a single trial. Appellant admits that, when a defendant commits multiple, similar crimes, they may be joined and charged in one Information. 22 O.S.2011, § 436; Glass v. State, 1985 OK CR 65, ¶ 8, 701 P.2d 765, 768. The transactions must refer to similar offenses, occurring over a relatively short period of time in approximately the same place, with overlapping proof showing a common scheme or plan. Collins v. State, 2009 OK CR 32, ¶ 14, 223 P.3d 1014, 1017; Glass, 1985 OK CR 65, ¶ 9, 701 P.2d at 768. "'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." Gilson v. State, 2000 OK CR 14, ¶ 46, 8 P.3d 883, 904 (citations omitted). The transactions must overlap because joinder is essentially designed to promote judicial economy by trying similar crimes together, conserving judicial resources. Smith v. State, 2007 OK CR 16, ¶ 28, 157 P.3d 1155, 1166. Appellant failed to object to joinder of the offenses below and we review for plain error. Collins, 2009 OK CR 32, ¶ 12, 223 P.3d at 1017. "Plain error is an actual error, that is plain or obvious, and that affects a defendant's substantial rights, affecting the outcome of the trial." Thompson v. State, 2018 OK CR 5, ¶ 7, 419 P.3d 261, 263.
¶20 We find no error. Appellant was charged with similar crimes, all occurring in a particular section of northeast Oklahoma City, over a span of just over six months. Appellant admits we have held that a "relatively short period of time" includes crimes committed within four to eight months of one another. Gilson, 2000 OK CR 14, ¶¶ 47-48, 8 P.3d at 904-05; Collins, 2009 OK CR 32, ¶ 15, 223 P.3d at 1017. He also admits we have held proximity in location may include crimes committed as much as five miles apart, Pack v. State, 1991 OK CR 109, ¶ 8, 819 P.2d 280, 283, or within the same county, Middaugh v. State, 1988 OK CR 295, ¶¶ 9-10, 767 P.2d 432, 435. Here, all the crimes occurred within the city limits in northeast Oklahoma City, and are thus in the same approximate location. Smith, 2007 OK CR 16, ¶ 25, 157 P.3d at 1165. Essentially, he argues that, despite this, the crimes are too far apart in time and location to be joined.
¶21 Appellant argues that joining multiple counts involving thirteen victims prejudiced him by allowing the State to "artificially strengthen its case". He argues that, under the definition of "common scheme or plan" used in other crimes cases, the proof of the crimes here does not overlap to show a common scheme or plan. However, Appellant admits we have rejected use of the other crimes definition in deciding joinder issues. Smith, 2007 OK CR 16, ¶¶ 28-29, 157 P.3d at 1166. Offenses may be joined for trial even though they could not be admissible as evidence of other crimes, if they otherwise meet the requirements for joinder. Id., ¶ 29 n.5, 157 P.3d at 1166 n.5. The evidence against Appellant shows a pattern of sexual offenses committed in the same way, against similar victims, under similar circumstances. Thus the proof related to each offense overlaps. Id., ¶ 31, 157 P.3d at 1167. The relationship or connection among the crimes in question was such that proof of one crime was relevant to prove the other charges. Collins, 2009 OK CR 32, ¶ 19, 223 P.3d at 1018.
¶22 Appellant notes that, if either the State or a defendant is prejudiced by joinder of offenses, the counts should be tried separately. 22 O.S.2011, § 439. However, a defendant must show that the joinder denied him a fair trial. Mitchell v. State, 2011 OK CR 26, ¶ 24, 270 P.3d 160, 171, overruled on other grounds by Nicholson v. State, 2018 OK CR 10, 421 P.3d 890. The record does not support Appellant's claim that he was prejudiced by joinder of the separate cases against him. He claims that the victims' testimony was largely unsupported by other evidence, arguing simply that they should not have been believed. We found in Proposition I that sufficient evidence supports Appellant's convictions; in addition, the testimony was in fact supported by police department records of Appellant's movements during the times in question. Although, as Appellant argues, the prosecutors repeatedly referred to the victims' testimony as a whole, jurors did not find Appellant guilty of offenses against every victim. In fact, jurors acquitted him entirely of charges against five victims, and in part of charges against two other victims. It is clear that jurors carefully and separately considered the evidence in each count, and pertaining to each victim. There was no plain error in the joinder of offenses, and Proposition II is denied.
Proposition III
¶23 In Proposition III Appellant claims that a "circus atmosphere" throughout the trial deprived him of a fundamentally fair trial. Appellant had the right to be tried by a jury free from outside influences which could affect the proceeding's fairness. Harris v. State, 2004 OK CR 1, ¶ 9, 84 P.3d 731, 740; Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Appellant did not request either a change of venue or a change of courtroom. After an incident on the tenth day of trial, Appellant asked that the jury be sequestered throughout the remainder of the trial. The trial court denied that motion, and Appellant makes no argument contesting that decision on appeal. Later, jurors were sequestered from the time the case was submitted to them until a verdict was reached. Sixty-six times throughout the trial, the trial court admonished jurors not to talk about the case or let anyone talk to them about it; to tell the bailiff if anybody approached them about the case; not to watch or read any news reports; and generally that all jurors' information about the case should come from the courtroom.
¶24 Appellant does not complain about pretrial publicity, admitting it was "not particularly substantial." He argues instead that publicity during the trial increased dramatically.[6] Appellant lists several incidents which occurred outside the courtroom during the trial, and which he says created a circus atmosphere. In the first, a bystander approached a juror in a different case, on a different floor of the courthouse, to comment about Appellant's case. There is nothing in the record to suggest in any way that Appellant was prejudiced by this incident, nor does Appellant make any argument suggesting how it might have affected his trial. He includes it as part of his claim that, in the aggregate, the circumstances in the courthouse denied him a fair trial. However, since there is no evidence that Appellant's jury had any idea this happened, it cannot usefully be part of an aggregate argument. This incident cannot have impermissibly affected jurors.
¶25 On the third day of trial, a spectator tried to take pictures in the courtroom. The trial court held an in camera hearing, questioned the man, and admonished him to leave his phone off while in the courtroom. Nothing in the record suggests jurors were affected in any way by this incident.
¶26 Before the jury was brought in on the fifth day of trial, defense counsel raised his concern about a news story which had aired the previous night, discussing the racial makeup of the jury. The story included interviews with persons not connected with the trial, some of which were conducted at the courthouse in front of the courtroom. Counsel stated he believed this was an underhanded threat to the jury, that it was jeopardizing the trial, and that it was out of the trial court's control. Counsel noted the extra-court behavior seemed to escalate as the trial continued. Counsel specifically stated he was not asking that jurors be sequestered; he said that he did not have any reason to believe Appellant's trial was anything other than fair and impartial, but he worried that there was "a storm brewing" and wanted to prevent any incidents. Instead, he asked to voir dire jurors as to potential media contacts and exposure, and for an admonishment over the long weekend for jurors to avoid social media. The court stated it would specifically emphasize social media issues in its standard admonition to jurors. The trial court arranged to station a deputy in the hallway during every break, to shield jurors from any unauthorized contact. At the time of the discussion, both parties and the trial court agreed that, as of that time, there was no indication that jurors had been affected by the media presence or interviews conducted outside the courtroom. Nothing in the subsequent record suggests that jurors were adversely affected by either media presence or publicity.
¶27 At the close of the sixth day of trial, defense counsel noted for the record that "it's getting really crazy out there in the hallway", especially early in the morning. He stated he did not know what remedy there might be and did not ask the trial court to take any action. With both parties' agreement, the trial court ordered a deputy to cordon off the media, in an area away from the juror stairwell and elevators, to protect jurors from being seen by cameras on their breaks.
¶28 As the seventh day of trial began, defense counsel mentioned a comment to a television news story on the station's Facebook page, in which a person identified by name said he knew a juror and that the juror had an opinion and would likely vote guilty. At Appellant's request, and with the State's full agreement, jurors were questioned individually and each denied knowing anyone with the commenter's name. With this established, the trial continued without objection. There is no indication the incident had any other effect.
¶29 On the eighth day of trial, a Friday, victim T.B. appeared in court for her second day of testimony possibly under the influence of benzodiazepine and PCP, as well as Seroquel. The parties delayed her testimony until after lunch, and discussed whether T.B. could testify that afternoon; she was detained during the lunch break after she created a disturbance in the hallway. The State suggested that she could be detained over the weekend and resume her testimony the following Monday. The trial court preferred to detain T.B. over the weekend, make sure she was sober, and have her testify the following Monday. Defense counsel opted to have her testify that afternoon, noting it might go to her credibility. Defense counsel stated, "I would just as soon put her on the stand now and have her finish her testimony." First, T.B.'s testimony does not constitute an outside influence that might improperly affect jurors. Second, Appellant fails to show either how he was prejudiced if she testified under the influence, or how that contributed to an unfair trial. He argues that his agreement to her testimony was a Hobson's choice. The record reflects that it was a strategic decision. After T.B.'s testimony, the trial court made a record that although she was sarcastic, she was coherent, seemed to comprehend the questions, and was able to remember what she wanted to remember and answer what she wanted to answer. The trial court found that T.B. was not inebriated on the stand and was a competent witness. Jurors acquitted Appellant of two of the charged crimes against T.B. Nothing in the record shows how her testimony, or her condition, improperly influenced jurors.
¶30 The record shows that throughout the morning of the tenth day of trial people in the courtroom could clearly hear protesters outside the courthouse chanting, "Give him life" and other things. Defense counsel asked that the protesters be removed, but the trial court noted the protesters had a permit. Appellant admits the trial court admonished jurors to disregard the chanting as irrelevant to the courtroom proceedings. He argues on appeal that the admonishment was "likely ineffective". This is just speculation, and the record does not support it.
¶31 That same morning, during the break, a protester in the hallway yelled "racist cop" and "racist jury" in front of two jurors. Concerned by the hostile environment, defense counsel asked whether the audience could be excused and the floor cleared before jurors left the courtroom. The trial court agreed, subsequently allowed jurors to leave the courtroom first at breaks and recesses, ordered a deputy to clear the floor each time jurors left, and said he would allow jurors to wait in the cleared courtroom until recesses ended. Appellant's request that jurors be sequestered for the remainder of the trial was denied. As the State noted, the bulk of the incidents had occurred in and around the courthouse during the trial proceedings; sequestration would neither prevent nor address those problems. Nothing in the record suggests that the trial court's measures were insufficient to protect the jury. The record does not show that any jurors complained that they had been approached or contacted, and nothing suggests jurors were inappropriately influenced by any incidents they may have seen or heard.
¶32 Appellant lists these incidents, but neither explains what this Court should do about them nor asks this Court for any specific relief. In his brief, Appellant says "it is understandable to some extent why the trial court did not want to take the extreme measures that were obviously necessary, such as moving the trial to another courtroom higher in the courthouse, if not another courthouse entirely, or to sequester the jury." However, Appellant never actually claims that the trial court should have done either of those things. He offers neither argument nor citation to authority to support such arguments. Instead, he repeats his observation that circumstances surrounding a trial may render a fair trial impossible. He cites in support a case from the Montana Supreme Court, featuring an angry mob attacking a judge over a bail decision, public meetings, vandalism, hostile publicity, and public statements about the case by the district attorney. State ex rel. Coburn v. Bennett, 655 P.2d 502, 507 (Mont. 1982). Appellant then claims that the individual incidents above might appear harmless, or have been cured by the trial court, but taken together they show "it was not possible for Appellant or anyone to get a fair trial." Beyond describing the incidents, he makes no effort to show how his trial was rendered unfair by these incidents. He also fails to ask this Court to reverse his convictions, or for a new trial, based on his claim that his trial was unfair.
¶33 The record does not support a conclusion that jurors were so affected by the incidents that they abandoned impartiality. In fact, as we note in Proposition II, the record shows that jurors carefully considered all the evidence against Appellant, accepting some and rejecting some. The fact that jurors acquitted Appellant of half the charges against him supports our conclusion that they were not improperly affected by events outside the courtroom. Proposition III is denied.
Proposition IV
¶34 In Proposition IV Appellant claims that the prosecutors' overzealous argument denied him due process and deprived him of a fair trial. Both parties have wide latitude to argue the evidence and its inferences, and we will not grant relief unless improper argument affects the fairness of the trial. Barnes v. State, 2017 OK CR 26, ¶ 6, 408 P.3d 209, 213. We will not grant relief unless errors in argument render a trial so fundamentally unfair that we cannot rely on the jury's verdict. Webster v. State, 2011 OK CR 14, ¶ 81, 252 P.3d 259, 281. Appellant objected to one comment, preserving that claim for appeal. He failed to object to the remainder of the comments, and we review for plain error. Mathis v. State, 2012 OK CR 1, ¶ 24, 271 P.3d 67, 76.
¶35 He first argues the prosecutor shifted the burden of proof in the first closing argument. Appellant admits the prosecutor first correctly stated the burden of proof, but argues she then negated it. The prosecutor's comment referred to a detailed discussion of the elements of each charged crime, with a description of the State's burden and the evidence supporting each element. In context, this was a comment on the evidence. Where the defense has not offered evidence, prosecutors may argue that evidence is uncontroverted. Bosse v. State, 2017 OK CR 10, ¶ 85, 400 P.3d 834, 863. After a similar comment in closing argument, Appellant's objections that the comment shifted the burden of proof and referred to Appellant's right to silence were sustained at the bench. Appellant did not ask that the jury be admonished. The jury was repeatedly told the correct burden of proof, in both argument and instruction. Appellant fails to show he was prejudiced, and the comment does not constitute plain error. Barnes, 2017 OK CR 26, ¶ 6, 408 P.3d at 213.
¶36 Appellant claims the prosecutor argued facts not in evidence. Appellant argues that neither the evidence nor science supports the prosecutor's argument in final closing that the DNA came from A.G.'s vaginal walls and was transferred where A.G. said it would be on his pants. Appellant claims that since the pockets, cuffs and seat of Appellant's uniform were never tested for DNA, one cannot argue there was no DNA at those locations. Regarding the latter claim, the prosecutor was reminding jurors where the evidence showed the DNA was -- near his zipper. This is not a misstatement of the evidence. The DNA expert witness referred to the source of DNA as "biological material" which could have been transferred in a liquid. A.G. herself testified that Appellant put his penis in her vagina. Suggesting that the DNA came from A.G.'s vagina, transferred by the vaginal fluids, was a reasonable inference from the evidence. Mathis, 2012 OK CR 1, ¶ 26, 271 P.3d at 77. There is no error.
¶37 Appellant claims that the prosecutor misstated facts regarding Appellant's statements to police. Detective Davis specifically testified that Appellant told her, in the interview, that he could not remember whether he had an erection during J.L.'s traffic stop. This argument was supported by Davis's testimony and is not a misstatement of fact.
¶38 Appellant also claims the prosecutor misstated facts when discussing the testimony of Kerri Hunt, Appellant's ex-girlfriend. Hunt and Appellant dated from March 2014 to March 2015. She testified about details of their life together, including daily Scripture reading and sleep habits. During his interview with detectives, Appellant said he had intercourse with Hunt the night of June 17, 2014. Hunt testified that she took a sleeping pill that evening; that the two didn't have intercourse that night; and that she told detectives as much on June 18. On cross-examination, Hunt said that Appellant could have been truthful with detectives, given the effect on her of the sleeping pill. In closing, the prosecutor condensed this, admitting he was being sarcastic but saying Appellant "had six days of medicated, unconscious intercourse with Kerri Hunt because it happens regularly before they read their Bible verses which would make her preacher daddy really proud I'm sure. That was catty, but it's the evidence." It was not, in fact, the evidence, and was wholly irrelevant to Hunt's testimony. This comment was improper and unprofessional. However, reviewing for plain error, Appellant has not shown how he was prejudiced by this comment. Mathis, 2012 OK CR 1, ¶ 24, 271 P.3d at 77.
¶39 Appellant alleges that, in final closing, the prosecutor repeatedly disparaged defense counsel. The prosecution should not cast aspersions on defense counsel. However, prosecutors may respond to points raised in defense closing argument. Warner v. State, 2006 OK CR 40, ¶ 182, 144 P.3d 838, 889, overruled on other grounds by Taylor v. State, 2018 OK CR 6, 419 P.3d 265. The prosecutor began this argument by praising defense counsel's professionalism. He subsequently noted that any evidence offered must be relevant, remarked on defense counsel's attempts to shift the jurors' focus, and on the difference between "good lawyering" and common sense or the real-world experiences of the victims. These were all reasonable responses to defense counsel's closing argument, which vigorously attacked the victims, the police investigation, and the State's presentation of its case. The prosecutor twice said that defense counsel was making the arguments you have to make when your client is guilty. The first time, he continued, "they attack the victims, they attack the investigation and they attack the prosecutors." This was a poorly phrased response to counsel's argument. However, again responding to argument, the prosecutor said defense counsel was a fine attorney, "But when your client's guilty you have to do things that take the attention off of your client." This assertion of Appellant's guilt was improper. However, Appellant does not show prejudice from this comment, and it does not rise to the level of plain error. Mathis, 2012 OK CR 1, ¶ 24, 271 P.3d at 77.
¶40 In defense closing, defense counsel said of testimony that Appellant saw one victim naked in the hospital, "I don't care and you shouldn't care." Throughout both cross-examinations and his closing argument, defense counsel attacked the victims, their families and lifestyles. Defense counsel also vigorously argued that the victims had drug and legal problems and/or felony convictions that showed they were deceitful and dishonest and that should affect their credibility. He said, "The witnesses that you saw in this courtroom don't care about the truth." The prosecutor responded in final closing that defense counsel didn't think jurors should care about the victims because they were lying felons with bad lifestyles, and this was Appellant's attitude; that Appellant believed he could do what he wanted to the victims because, given their past actions and lifestyles, he didn't care about them and nobody else should. Appellant claims this both maligned defense counsel and misrepresented his argument. On the contrary, it precisely quoted defense counsel's remark about one victim, and neatly encapsulated the majority of Appellant's defense, as presented by counsel's argument.
¶41 No comments constituted plain error. While occasionally the argument may have overreached, the record shows that jurors carefully considered all the evidence against Appellant, acquitting him of half the charges against him. Appellant cannot show he was prejudiced by any of the comments, taken as a whole or individually. Proposition IV is denied.
Proposition V
¶42 In Proposition V Appellant claims trial counsel was ineffective. He must show that counsel's performance was deficient, and that the deficient performance was prejudicial. Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984);Tucker v. State, 2016 OK CR 29, ¶ 12, 395 P.3d 1, 5. Counsel's deficient performance must constitute objectively unreasonable decisions which undermine confidence in the trial's outcome. White v. State, 2019 OK CR 2, ¶ 23, 437 P.3d 1061, 1070. Appellant must show he was actually prejudiced by counsel's acts or omissions. Williams v. Taylor, 529 U.S. 362, 394, 120 S.Ct. 1495, 1513-14, 146 L.Ed.2d 389 (2000); Strickland, 466 U.S. at 693, 104 S.Ct. at 2067; Marshall v. State, 2010 OK CR 8, ¶ 61, 232 P.3d 467, 481.
¶43 Appellant claims that trial counsel failed to present available evidence to impeach victim T.B. After T.B. testified, defense counsel was informed that a teenage witness said T.B. had been handcuffed before the witness went into the house. Appellant argues that this story contradicted T.B.'s testimony. The record shows that any failure to call this witness was a strategic decision. The witness did not see anything that happened after she went into T.B.'s house, before the crimes against T.B. occurred. Appellant fails to show any prejudice from trial counsel's failure to use this information.
¶44 Appellant argues that trial counsel should have objected to the joinder of offenses into a single case. We found in Proposition II that Appellant's separate cases were properly joined for a single trial. As there was no error, counsel was not ineffective for failing to object to the joinder. Appellant argues that trial counsel should have objected to prosecutorial misconduct in argument. We found in Proposition IV that isolated errors in argument did not rise to the level of plain error. As the outcome of the trial was not affected, trial counsel was not ineffective for failing to object.
¶45 Appellant claims that trial counsel completely failed to challenge the DNA evidence. This evidence went only to the three charges involving A.G., Counts 30, 31, and 32. Appellant, unwilling to admit that the utility of this evidence was limited, argues that the admission of this DNA evidence affected every count and every conviction, claiming that it was the "only independent evidence" substantiating any of the claims. He argues that without this DNA evidence, pertaining to a single victim and three counts, jurors would have acquitted him of all the crimes. Before discussing the merits of the claim, we note that the record simply does not support this allegation of prejudice. Appellant admits jurors acquitted him of half the charges against him; his attempt to use this as proof that, without this evidence, they would have acquitted him of everything is not substantiated. On the contrary, jurors were instructed to give separate consideration to each offense. The record shows jurors followed that instruction, and we cannot conclude this evidence affected every verdict. Smith v. State, 2007 OK CR 16, ¶ 38, 157 P.3d 1155, 1168. The State provided extensive corroborating evidence, in the form of records of Appellant's movements and locations while on duty on the days the crimes occurred; witnesses also corroborated each victim whose testimony supported a conviction, regarding their words and actions subsequent to the crimes. As to all but Counts 30, 31 and 32, the record does not show this evidence had any effect on the verdicts. Appellant fails to show any prejudice regarding his other fifteen convictions.
¶46 Consequently, we review this claim only for its effect on the convictions on Counts 30, 31, and 32. The police chemist, Taylor, found A.G.'s DNA along the zipper line on the inside and outside of Appellant's pants. Appellant does not contest the conclusion that the DNA was A.G.'s. Taylor could not say whether the DNA came from urine, saliva, or vaginal fluid, and called it "biological material". She said that it was more likely that epithelial cells contained in a fluid could be absorbed by fabric. Taylor testified that, because Appellant was not a contributor to the DNA sample, there was a good possibility that the cells had been in a liquid such as vaginal fluid and transferred to Appellant's pants. She testified she could say only that the DNA was in A.G.'s biological material, and where on Appellant's pants it was found, not how it got there. On cross-examination Taylor admitted the DNA could have been the result of a secondary transfer from something as innocuous as Appellant's previous search of A.G.'s purse. She confirmed that she had found biological material, and attempted to match it to a person, but could not tell how long the material had been there; she agreed that it could have been a secondary transfer.[7] Defense counsel also confirmed that Taylor had only tested the zipper area, without testing the pockets, legs or waist, for either Appellant's own DNA or any indication of other transfer DNA on those areas.
¶47 Appellant now argues that trial counsel should have challenged this evidence more comprehensively. He argues that neither the evidence at trial nor the current science supports a claim that A.G.'s DNA came from her vaginal walls -- a claim Taylor never made. In fact, trial counsel did challenge this evidence. Appellant admits that on cross-examination Taylor agreed the DNA could have been from a secondary transfer. In closing, defense counsel used this to argue that the skin cells could have been the direct result of secondary transfer DNA from Appellant's legitimate search of A.G.'s purse.
¶48 Appellant claims this cross-examination and argument were not enough. Generally, if there is no showing of incompetence, the "fact that another lawyer would have followed a different course" is not reason enough to find trial counsel ineffective. Lee v. State, 2018 OK CR 14, ¶ 15, 422 P.3d 782, 786-7 (quoting Shultz v. State, 1991 OK CR 57, ¶ 9, 811 P.2d 1322, 1327). Appellant argues that trial counsel should have presented his own expert to refute Taylor's "conclusions and characterizations of the evidence."[8] Appellant argues that Taylor's testimony that he was not a contributor to the DNA is not supported by Taylor's own results. Appellant also argues that Taylor should have been asked about the actual quantities of DNA found on the garment, which he claims were modest at best. Appellant supports this claim in part with extra-record affidavits filed with his Rule 3.11 motion. As that information is not in the record, we do not consider it in determining the claim's merits. No record evidence supports his claim that Taylor's testimony about Appellant's contribution to the DNA was inaccurate, or that the quantity of DNA was modest and thus more likely to be the product of secondary transfer. Any decision not to challenge Taylor's claim that Appellant was not a contributor was a reasonable strategic decision. The absence of his DNA lent credibility to Appellant's defense that the material was the result of secondary transfer. Trial counsel elicited or used admissions that (a) Taylor could not state the source of A.G.'s DNA beyond calling it "biological material", (b) she did not know how it got onto Appellant's pants, and (c) the DNA could have been the result of secondary transfer. We cannot say from the trial record that Appellant was prejudiced by trial counsel's failure to present an expert to specifically rebut Taylor's testimony. On this record, trial counsel was not ineffective for failing to present a defense DNA expert.
¶49 Trial counsel was not ineffective, and Proposition V is denied.
Rule 3.11(B) Application
¶50 In connection with his claim of ineffective assistance of counsel Appellant filed a Rule 3.11(B) application for an evidentiary hearing. Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019). There is a strong presumption of regularity in trial proceedings and counsel's conduct, and the application and affidavits must contain sufficient information to show by clear and convincing evidence the strong possibility that trial counsel was ineffective for failing to identify or use the evidence at issue. Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019). We "thoroughly review and consider Appellant's application and affidavits along with other attached non-record evidence[.]" Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905. The Rule 3.11 standard set out above is easier for a defendant to meet than the Strickland standard, as a defendant must only provide clear and convincing evidence that there is a strong possibility counsel was ineffective. Id. A Rule 3.11(B) motion must be accompanied by affidavits supporting the allegation of ineffective assistance of counsel. Id.
¶51 In stating his claim in his Rule 3.11 Application, Appellant refers to Proposition V of his brief for the factual basis and substantive argument. Appellant then claims that the DNA evidence was not challenged "in any meaningful way." However, the record shows defense counsel vigorously cross-examined Taylor regarding secondary transfer, her failure to run certain tests on the biological material, her failure to examine the pants themselves with a specialized lighting instrument, and the factual limitations of her testimony regarding length of time present, sources, methods of transfer, and mediums of transfer for DNA samples. Defense counsel also established that Taylor tested only a single area of the pants, without testing any other areas where one might expect to find DNA.
¶52 Appellant reiterates his claim that trial counsel should have called a defense DNA expert to rebut Taylor's testimony and bolster his own defense. He argues that the defense expert testimony would have been based on extant, relevant evidence available to trial counsel. In support, Appellant provides the affidavit of Dr. Spence, a forensic biologist and DNA expert. Spence reviewed the Oklahoma City Police Department forensic examination reports including worksheets, analyst bench notes, electropherograms, population statistical calculations, DNA extraction and quantification, law enforcement investigative reports, trial testimony transcripts and evidence -- all sources available to trial counsel.
¶53 Spence avers that Taylor's testimony was not consistent with her DNA data. Taylor testified that Appellant was excluded as a contributor from all four swabs. Spence first says that the DNA data sheet actually states that a number of nanograms of male DNA were recovered from two of the swabs (17Q3 and 17Q4); thus, he says, Taylor's testimony that the DNA was only female was inaccurate. In addition to the male DNA found on two swabs, Spence says Taylor's examination report stated that the DNA profile on a third swab (17Q2A) was a mixture, with too little of the minor component to compare to known sources. He states that Taylor's report on that swab was thus inconclusive, rather than (as she testified) excluding Appellant. Spence thus determines that Taylor's testimony was inconsistent with her own findings. Spence concludes that these results are also inconsistent with Taylor's testimony that, as Appellant's DNA was not on his pants, there was a very good possibility that the DNA found there was transferred in a liquid such as vaginal fluid.
¶54 Spence also avers that Taylor's testimony regarding vaginal fluid was inconsistent with the state of science and her own findings. Taylor testified she inspected the pants with an ambient light source, not a specialized instrument usually used for those purposes. Spence refers to Taylor's conclusion that A.G. would likely have had "quite a bit of lubrication", which could transfer cells, as speculative. Spence states this speculation, and the prosecutor's subsequent argument based on it, could have been rebutted with expert testimony.
¶55 Spence notes that the DNA mixture found on two swabs (17Q1 and 17Q2) included alleles that could not have originated from either A.G. or Appellant. He speculates on various ways these alleles could have appeared in the mixture. He asserts that trial counsel should have asked Taylor where the stray alleles came from. Spence states that exploration of the extra alleles in the mixture (either with a defense expert or through cross-examination) would have supported Appellant's claim that the DNA was a secondary transfer, and rebutted the prosecution's argument that such transfer was unlikely. He further notes that alleles from two swabs (17Q3 and 17Q4) included a male contribution, which was or could have been consistent with Appellant's DNA profile, and thus Taylor's findings were inconsistent with her conclusion that Appellant was excluded as a contributor.
¶56 Spence avers that Taylor's findings show only "modest quantities" of A.G.'s DNA were present on all four swabs. He states that Taylor's findings did not report high DNA yields on any swab. He notes that the DNA yield from a car door, also tested in the case, was equal to the yield on one swab and higher than the other three. Spence states that the issue of the quantity of DNA -- the DNA yield -- should have been raised because it was relevant to the issue of whether vaginal fluid was present.
¶57 Spence avers that officers mishandled the pants. He states a video of the interrogation shows an officer open a bag with his hand before placing Appellant's personal items, belt, and pants in the bag. He states that Taylor's report shows she did not take any control samples from the pants or belt; he suggests that control samples could have provided evidence supporting the probability of an inadvertent transfer.
¶58 Spence also avers that defense counsel could and should have used scientific principles concerning DNA transfer and testing in Appellant's defense. He particularly refers to principles of DNA transfer, scientific literature supporting DNA transfer events, and the sensitivity of DNA testing. He suggests that a DNA expert could have assisted trial counsel in interpreting Taylor's results and challenging her conclusions, and in explaining to jurors the principles surrounding DNA transfer and the likelihood of secondary transfer occurring here.
¶59 While Appellant argues in his 3.11 Application that he must show trial counsel's performance fell below an objective standard of reasonableness under Strickland, that is not our first query. Under Rule 3.11(B), we first determine whether the affidavit in support of the Application shows, by clear and convincing evidence, the strong possibility that trial counsel was ineffective for failing to identify or use the evidence at issue. Rule 3.11(B)(3)(b)(i). Appellant argues that Spence's affidavit supports the conclusion that Taylor's testimony was inconsistent with her findings (a) because several swabs included a DNA mixture, two had a male DNA component, and some alleles were from unidentified contributors, and (b) the quantities of DNA present did not have sufficient yield to support Taylor's testimony that the DNA came from vaginal fluid. He also argues that Spence's affidavit supports his claim that science and Taylor's findings support the possibility that the DNA was the result of secondary transfer, and that possibility was not sufficiently raised.
¶60 Many of Appellant's claims turn on the way in which A.G.'s DNA was deposited on Appellant's pants. There is no real disagreement that this occurred through a transfer of some sort. The State did not specifically describe the method of transfer, but argued that A.G.'s DNA was transferred to "the exact location she says his penis came in contact." Appellant consistently argued the material appeared through a secondary transfer after Appellant searched A.G.'s purse. Appellant claims, based on Spence's affidavit, that through properly challenging the DNA evidence, defense counsel could have supported his claim of secondary transfer. This is the focus of our analysis of these claims.
¶61 For purposes of this analysis, taking the assertions in Spence's affidavit as true, it appears that Taylor may have either misinterpreted or misstated her own findings regarding the possible presence of male DNA as a contributor to the DNA found on the different pants swabs. However, Appellant must still show that this possibly mistaken testimony meets the standard above. At trial and on appeal -- and in this application for evidentiary hearing -- Appellant does not contest that the DNA was primarily A.G.'s. Spence's affidavit raises the possibility that some of the DNA might have belonged to Appellant, though, as Spence did not independently test the samples, this appears to be speculation. Again, taking this assertion as true, Appellant fails to meet the standard. Both parties questioned Taylor repeatedly about her claim that she did not find Appellant's DNA on his pants, even though everyone agreed they were his, he had worn them, and evidence showed they were not washed before the DNA testing.
¶62 Appellant now claims that information that Appellant might have contributed to the DNA would have supported his claim that A.G.'s DNA was the result of a secondary transfer. He fails to show how. The record clearly shows that everyone expected Appellant's DNA to be on his own pants. Everyone agreed that A.G.'s DNA was transferred to the pants. If Appellant's DNA were, in fact, present in the samples from the zipper area, this would show only that Appellant's DNA was on his pants near his zipper and might have mingled with the transferred DNA. Appellant does not show, and Spence's affidavit does not explain, how such evidence could possibly lend particular support to either a "vaginal fluid" transfer or secondary transfer theory; it could support either one. He similarly fails to show how, specifically, his theory of secondary transfer would have been supported by information that alleles from other individuals may have been present in the DNA samples. Appellant's argument regarding the quantity of DNA recovered suffers from the same defect.
¶63 Next, as we discuss above, Taylor never testified the DNA was transmitted in vaginal fluid; on the contrary, more than once Taylor testified she could not describe the medium as anything other than biological material, and could not say where it came from or how it got to Appellant's pants. Over the course of questioning, the prosecutor asked whether, given the location of the material and the context of the allegations -- A.G.'s testimony that Appellant's penis entered her vagina -- it was likely that the medium was fluid and was, specifically, vaginal fluid. Taylor responded that, given that context, it was a likely possibility. Her comment regarding lubrication was made in that context. Appellant argues that the low quantity of DNA recovered from the samples did not support any conclusion that the DNA medium was vaginal fluid. Spence appears to suggest that, logically, if the DNA sample yield was low, it is more likely that it originated from handling or contact with an object rather than transfer through vaginal fluid. While, if true, this may have supported an argument by defense counsel, it could not have countered testimony that Taylor never gave. The allegation in this Application is that defense counsel failed to counter Taylor's testimony regarding the DNA evidence, and the affidavit does not support that claim.
¶64 Spence's remaining concerns likewise do not raise a strong possibility that trial counsel was ineffective. Spence's opinion that the uniform pants were improperly handled (a) appears to be speculation, and (b) does not support Appellant's claim. Spence complains that Appellant himself handled all his personal items, before they were placed in the same evidence bag. He argues that Taylor should have taken control samples from places on the pants where there was little likelihood of finding incriminating biological materials. At best, Spence's first observation suggests that Appellant's own hands, or some personal possession other than Appellant's pants, might have contained A.G.'s DNA and transferred it to the outer and inner zipper area. His second observation leaves open the possibility that Taylor could have found no more DNA, or more of Appellant's own DNA, or A.G.'s DNA on less likely portions of Appellant's pants. Appellant fails to show how any of these possibilities make a secondary transfer more likely, or would have shown that such a transfer was, as Spence put it, "inadvertent". In fact, as Spence and Appellant both point out, and as Taylor testified, an expert cannot testify whether a transfer is inadvertent or deliberate. Spence also lists what he describes as scientific principles, and findings in scientific literature, regarding both the mechanics of DNA testing and secondary transfers. Appellant fails to show that this material, presented either through cross-examination or by an expert, would have more significantly aided jurors than the evidence elicited by defense counsel.
¶65 Appellant has failed to show by clear and convincing evidence the strong possibility that trial counsel was ineffective for failing to identify the alleged shortcomings in Taylor's testimony, or to use the information contained in the affidavit, either through cross-examination or by presenting his own expert on DNA evidence. Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019). Appellant's Application for Evidentiary Hearing is denied.
Proposition VI
¶66 In Proposition VI Appellant argues that his total sentence of 263 years is excessive. Appellant admits that each of his eighteen sentences is within the range of punishment. He complains that, taken together, the sentences are excessive, and argues that the trial court should not have run his sentences consecutively. At sentencing, defense counsel asked for mercy and for the judge to do the right thing but did not specifically ask for concurrent sentences. The decision to run sentences consecutively or concurrently is within the trial court's discretion. Neloms v. State, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170. An abuse of discretion is any unreasonable or arbitrary action made without proper consideration of the relevant facts and law, also described as a clearly erroneous conclusion and judgment, clearly against the logic and effect of the facts. State v. Hovet, 2016 OK CR 26, ¶ 4, 387 P.3d 951, 953.
¶67 Appellant argues that he is a young, productive man who was dedicated to serving the people and law-abiding up until his arrest. He states that his life has been forever ruined. We have already rejected Appellant's claims that there was insufficient evidence to support the convictions, or that it was unfair for him to answer for all the crimes in a single case. He admits that jurors acquitted him of half the charges, but appears to claim that this somehow shows the remaining charges against him were unsupported. He finally claims that the joinder of the cases allowed his sentences to be stacked unfairly. He fails to show how exactly this "stacking" is unfair. Each sentence in this case represents a consequence of a separate crime, involving separate victims. The record does not support a conclusion that the trial court abused its discretion in ordering the sentences to run consecutively. Proposition VI is denied.
Proposition VII
¶68 In Proposition VII Appellant claims accumulated error requires relief. We found no error in the preceding propositions. Where there is no error, there will be no cumulative error. Engles v. State, 2015 OK CR 17, ¶ 13, 366 P.3d 311, 315. Proposition VII is denied.
DECISION
¶69 The Judgments and Sentences of the District Court of Oklahoma County are AFFIRMED. The Application for Evidentiary Hearing on Sixth Amendment Claims is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019), the MANDATE is ORDERED issued upon the delivery and filing of this decision.
AN APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE TIMOTHY R. HENDERSON, DISTRICT JUDGE




ATTORNEYS AT TRIAL
SCOTT ADAMS
ROBERT GRAY
ADAMS & ASSOCIATES 401 N. HUDSON AVE., STE. 100 OKLAHOMA CITY, OK 73102 COUNSEL FOR DEFENDANT

GAYLAND GIEGER LORI MCCONNELL ASST. DISTRICT ATTORNEYS 320 ROBERT S. KERR, STE. 505 OKLAHOMA CITY, OK 73102 COUNSEL FOR STATE 

ATTORNEYS ON APPEAL
JAMES H. LOCKARD DEPUTY DIVISION CHIEF MICHAEL D. MOREHEAD HOMICIDE DIRECT APPEALS DIVISION OKLA. INDIGENT DEFENSE SYS. P.O. BOX 926 NORMAN, OK 73070 COUNSEL FOR APPELLANT
MIKE HUNTER ATTORNEY GENERAL OF OKLA. KEELEY L. MILLER ASST. ATTORNEY GENERAL 313 NE 21ST STREET OKLAHOMA CITY, OK 73105 COUNSEL FOR APPELLEE 

OPINION BY KUEHN, V.P.J.
LEWIS, P.J.: SPECIALLY CONCUR
LUMPKIN, J.: CONCUR
HUDSON, J.: CONCUR
MUSSEMAN, S.J.*: CONCUR
*The Hon. William J. Musseman, District Judge of Tulsa County, sitting by assignment.
FOOTNOTES
[1] Appellant wa s acquitted of crimes charged in Counts 2, 3, 6, 7, 9, 12, 17-26, 35, and 36, including sexual battery, procuring lewd exhibition, first degree burglary, stalking, forcible oral sodomy, first and second degree rape, and indecent exposure.
[2] Counts 4, 5, and 15.
[3] Counts 11, 28, 29 and 32.
[4] Counts 8, 10, 16, and 27.
[5] Counts 1, 13, 14, 30, 33 and 34.
[6] Appellant also claims that voir dire improperly included questions regarding negative media reports about police officers. The prosecutor specifically referred to stories about situations stemming from police actions in Baltimore and a case involving a school resource police officer, as well as indirectly referring to protests and riots in Ferguson, Missouri. However, in context, the prosecutor was trying to explore with potential jurors reasons the victims might not have reported Appellant's crimes to police.
[7] After Appellant's trial had concluded and while this appeal was pending before this Court, we remanded this case for hearings tangentially connected with the DNA claims raised in this proposition. Neither those hearings, the issues they discussed, nor the contemporaneous and subsequent documents filed with this Court concerning them are relevant to the issues raised in either this appeal or Appellant's Rule 3.11(B) Application. We neither discuss nor consider them in determining the appeal or the Application.
[8] The State argues that trial counsel had retained a DNA expert who was present in the courtroom for Taylor's testimony, and the failure to call that expert was a strategic choice. However, nothing in the record supports this assertion, and we do not consider it as part of the analysis of Proposition V.




LEWIS, PRESIDING JUDGE, SPECIALLY CONCURRRING: 
¶1 I commend my colleague on a well written decision. I write separately to address Appellant's propositions one, two, and six. I will initially address the excessive sentence claim raised in proposition six.
¶2 This case involves a sexual predator who happened to be employed, most unfortunately, as an Oklahoma City police officer. He used his position of authority to intimidate and prey on vulnerable victims. The facts and circumstances of this case, including his position of authority, the number of victims, and the callous nature of the offenses, dictate that consecutive sentences in this case are entirely appropriate. His arguments attacking the convictions are likewise unavailing.
¶3 Appellant attacks these convictions in proposition one. He first claims his convictions for procuring lewd exhibition, 21 O.S.2011, § 1021(A)(2), were unsupported because he did not procure or compel the obscene exhibition of the victims for the sexual pleasure of others. Nothing in the statute prohibits the person procuring or compelling the exhibition be different from the viewer. We correctly hold today that the procurer and the viewer can be the same person. He procured the exhibition for his own view and for his own sexual stimulation. I, therefore, agree that this crime was established by the evidence. The language in the Information stating that he did these acts under his authority as a police officer is surplusage. The procuring of the obscene exposure does not have to be by any type of force, which the command by a police officer might infer.
¶4 This brings us to the sufficiency of the force element of the rape and sodomy charges. Appellant's unique position gave him the power to demand sexual acts of victims facing the unfavorable alternative choices of jail or detox. This constitutes force and the evidence was sufficient to prove the force element. He also committed sexually battery by touching the victims in a lewd and lascivious manner. He did not commit the touching as part of a search or pat down pursuant to detention. I, therefore, concur that the evidence was sufficient to show that the touchings were committed lewdly and lasciviously.
¶5 Proposition two involves the joinder of all of these offenses committed against thirteen separate victims in one trial. Appellant absolutely made no request for separate trials in this case. Joinder was proper and he was not prejudiced by the joinder or the failure to request severance of the charges.
¶6 These offenses show a pattern of sexual predation committed in similar ways, with similar intents, under similar circumstances. Joinder of these offenses was proper because the counts arose from the same type of offense occurring within a few months, in approximately the same area of the city, and the proof of each transaction overlapped so as to show a common scheme or plan. Cummings v. State, 1998 OK CR 45, ¶ 15, 968 P.2d 821, 829; Glass v. State, 1985 OK CR 65, ¶ 9, 701 P.2d 765, 768; see also Lott v. State, 2004 OK CR 27, ¶ 34, 98 P.3d 318, 333. Common scheme or plan transactions refer to a series of occurrences "depending not so much upon the immediateness of their connection as upon their logical relationship." Plunkett v. State, 1986 OK CR 77, ¶ 7, 719 P.2d 834, 838. These offenses were logically connected and they met the other criteria for joinder. Their joinder, therefore, in one Information and trial was appropriate.
¶7 Appellant, furthermore, was not unfairly prejudiced by the joinder. Likely, had the cases been tried separately, evidence of other non-charged offenses would have been admissible under 12 O.S.2011, § 2404(B). This would not have spared Appellant in any manner. Moreover, Appellant was acquitted on half of the charges, showing that the jury was not influenced unfairly by the trial of multiple counts. He has shown neither error nor injury from the joint trial of these offenses.
¶8 Again, I commend my colleague and concur in the well written opinion.




 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1988 OK CR 295, 767 P.2d 432, MIDDAUGH v. STATE
Discussed
 1991 OK CR 57, 811 P.2d 1322, SCHULTZ v. STATE
Discussed
 1991 OK CR 109, 819 P.2d 280, PACK v. STATE
Discussed
 1994 OK CR 55, 880 P.2d 401, SKELLY v. STATE
Discussed
 2004 OK CR 1, 84 P.3d 731, HARRIS v. STATE
Discussed
 2004 OK CR 21, 90 P.3d 556, EASLICK v. STATE
Discussed at Length
 2004 OK CR 27, 98 P.3d 318, LOTT v. STATE
Discussed
 2006 OK CR 40, 144 P.3d 838, WARNER v. STATE
Discussed
 2006 OK CR 44, 146 P.3d 1141, HEAD v. STATE
Discussed
 2007 OK CR 16, 157 P.3d 1155, SMITH v. STATE
Discussed at Length
 2009 OK CR 32, 223 P.3d 1014, COLLINS v. STATE
Discussed at Length
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed
 2010 OK CR 8, 232 P.3d 467, MARSHALL v. STATE
Discussed
 2011 OK CR 14, 252 P.3d 259, WEBSTER v. STATE
Discussed
 2011 OK CR 26, 270 P.3d 160, MITCHELL v. STATE
Discussed
 2012 OK CR 1, 271 P.3d 67, MATHIS v. STATE
Discussed at Length
 2012 OK CR 7, 274 P.3d 161, NELOMS v. STATE
Discussed
 2013 OK CR 14, 306 P.3d 557, SMITH v. STATE
Discussed
 2015 OK CR 17, 366 P.3d 311, ENGLES v. STATE
Discussed
 2016 OK CR 26, 387 P.3d 951, STATE v. HOVET
Discussed
 2016 OK CR 29, 395 P.3d 1, TUCKER v. STATE
Discussed
 2017 OK CR 7, 394 P.3d 1281, ROUSCH v. STATE
Discussed
 2017 OK CR 10, 400 P.3d 834, BOSSE v. STATE
Discussed
 2017 OK CR 26, 408 P.3d 209, BARNES v. STATE
Discussed at Length
 2018 OK CR 5, 419 P.3d 261, THOMPSON v. STATE
Discussed
 2018 OK CR 6, 419 P.3d 265, TAYLOR v. STATE
Discussed
 2018 OK CR 10, 421 P.3d 890, NICHOLSON v. STATE
Discussed
 2018 OK CR 14, 422 P.3d 782, LEE v. STATE
Discussed
 2019 OK CR 2, 437 P.3d 1061, WHITE v. STATE
Discussed
 1948 OK CR 27, 192 P.2d 301, 86 Okl.Cr. 273, Hulsey v State
Cited
 1982 OK CR 137, 650 P.2d 880, GRAY v. STATE
Discussed
 1998 OK CR 45, 968 P.2d 821, 69 OBJ 2901, Cummings v. State
Discussed
 1985 OK CR 65, 701 P.2d 765, GLASS v. STATE
Discussed at Length
 2000 OK CR 14, 8 P.3d 883, 71 OBJ 2063, Gilson v. State
Discussed at Length
 1986 OK CR 77, 719 P.2d 834, PLUNKETT v. STATE
Discussed
 1987 OK CR 140, 739 P.2d 1006, LAWSON v. STATE
Discussed at Length
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2404, Character Evidence Not Admissible to Prove Conduct - Exceptions - Other Crimes
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 13.1, Required Service of Minimum Percentage of Sentence - Offenses Specified
Cited
 21 O.S. 1021, Indecent Exposure - Indecent Exhibitions - Obscene or Indecent Writings, Pictures, Etc. - Solicitation of Minors
Discussed at Length
 21 O.S. 111, 21 O.S. 111, Definition - Force
Discussed
 21 O.S. 888, 21 888, Forcible Sodomy
Discussed
 21 O.S. 1021.1, Application of Act
Cited
 21 O.S. 1111, Rape Defined
Discussed at Length
 21 O.S. 1123, Lewd or Indecent Proposals or Acts to Child Under 16
Discussed
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 436, Charging of Two or More Defendants in Same Indictment or Information-Counts
Cited
 22 O.S. 439, Relief from Prejudicial Joinder
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA